# 13-

# United States Court of Appeals

*for the*

# Second Circuit

RETIREMENT BOARD OF THE POLICEMEN'S ANNUITY
AND BENEFIT FUND OF THE CITY OF CHICAGO, *et al.*
(on Behalf of Itself and Similarly Situated Certificate Holders),

*Plaintiffs-Petitioners,*

— v. —

THE BANK OF NEW YORK MELLON
(as Trustee Under Various Pooling and Servicing Agreements),

*Defendant-Respondent.*

_____

ON PETITION FOR PERMISSION TO APPEAL FROM THE UNITED STATES
DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK
NO. 1:11-CV-05459 (WHP)

## PETITION FOR INTERLOCUTORY APPEAL

BETH A. KASWAN
DEBORAH CLARK-WEINTRAUB
MAX SCHWARTZ
SCOTT+SCOTT,
ATTORNEYS AT LAW, LLP
*Attorneys for Plaintiffs-Petitioners*
The Chrysler Building
405 Lexington Avenue, 40th Floor
New York, New York 10174
(212) 223-6444

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. ii

INTRODUCTION ..........................................................................1

QUESTION PRESENTED ..............................................................2

RELIEF SOUGHT ........................................................................2

BACKGROUND ...........................................................................3

    A.    Nature of the Case ..............................................................3

        1.    Securitization of Mortgages and Creation of the Covered Trusts ............................................................3

        2.    BNYM's Duties as Trustee of the Covered Trusts ....................4

        3.    BNYM Injured All the Trusts in a Common Way by Failing to Enforce Their Rights Against Countrywide ..............5

    B.    BNYM's "class standing" argument ........................................8

    C.    This Court's opinion in *NECA-IBEW* .....................................8

REASONS FOR PERMITTING THE APPEAL ....................................12

    A.    The standard for an interlocutory appeal is satisfied ..........................12

        1.    The interlocutory appeal concerns a "pure" question of law ...................................................................13

        2.    The class standing question qualifies as "controlling." ............17

        3.    There are substantial grounds for differences of opinion ........19

CONCLUSION ............................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Ahrenholz v. Bd. of Trustees of Univ. of Ill.*,
219 F.3d 674 (7th Cir. 2000) ...................................................................1, 13

*Casey v. Long Island R.R. Co.*,
406 F.3d 142 (2d Cir. 2005) ................................................................. 12-13

*City of New York v. Beretta U.S.A. Corp.*,
524 F.3d 384 (2d Cir. 2008) ........................................................................1

*Doninger v. Niehoff*,
642 F.3d 334 (2d Cir. 2011) ......................................................................13

*Gratz v. Bollinger*,
539 U.S. 244 (2003)....................................................................................12

*In re Duplan Corp.*,
591 F.2d 139 (2d Cir. 1978) ......................................................................18

*In re F.C.C.*,
208 F.3d 137 (2d Cir. 2000) ......................................................................15

*In re Kemp*,
440 B.R. 624 (Bankr. D.N.J. 2010) ............................................................7

*Kiobel v. Royal Dutch Petroleum Co.*,
621 F.3d 111 (2d Cir. 2010) ......................................................................13

*Klinghoffer v. S.N.C. Achille Lauro*,
921 F.2d 21 (2d Cir. 1990) ........................................................................18

*McFarlin v. Conseco Services, LLC*,
381 F.3d 1251 (11th Cir. 2004) .................................................................13

*Murray v. Metro. Life Ins. Co.*,
583 F.3d 173 (2d Cir. 2009) ......................................................................13

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
693 F.3d 145 (2d Cir. 2012) ...............................................................*passim*

*NML Capital, Ltd. v. Banco Central de la Republica Argentina*,
652 F.3d 172 (2d Cir. 2011) ......................................................................13

*Policemen's Annuity and Benefit Fund of the City of Chicago v.*
  *Bank of America, NA, et al.,*
  Case No. 1:12-cv-02865 (S.D.N.Y. Dec. 7, 2012)................................19, 20

*Staehr v. Hartford Fin. Servs. Grp., Inc.,*
  547 F.3d 406 (2d Cir. 2008) ................................................... 14-15

*The Bank of New York Mellon v. Walnut Place LLC, et al.,*
  No. 11-cv-5988 (WHP) (S.D.N.Y.)....................................................4, 14, 15

*U.S. v. Stanley,*
  483 U.S. 669, 107 S. Ct. 3054 (1987) ...........................................................1

*Weber v. U.S.,*
  484 F.3d 154 (2d Cir. 2007) ......................................................13

**Statutes & Other Authorities:**

Article III of the U.S. Constitution ................................................3, 8, 10

28 U.S.C. § 1292(b) ...............................................................*passim*

Securities Act of 1933 § 11...........................................................9, 10

Securities Act of 1933 § 12(a)(2)......................................................9, 10

# INTRODUCTION

This petition for interlocutory appeal presents an important and recurring question concerning the extent to which this Court's recent "class standing" opinion in *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145 (2d Cir. 2012) ("*NECA-IBEW*") applies to cases that purchasers of residential mortgage backed securities ("MBS") have brought against conflicted MBS trustees for failing to perform their most basic responsibilities in the face of overwhelming evidence that defective mortgages had been sold to related MBS trusts.[1]  This is precisely the kind of issue that 28 U.S.C. §1292(b) was meant to address: it involves a "pure question of law" that this Court can "decide quickly and cleanly." *Ahrenholz v. Bd. of Trustees of Univ. of Ill.*, 219 F.3d 674, 677 (7th Cir. 2000). Moreover, immediate appellate review would remove the cloud of legal uncertainty that currently hangs over claims relating to over 500 Countrywide Trusts that the District Court dismissed from the case on standing grounds, and

---

[1] The "class standing" question was not one of the issues that the District Court addressed in denying reconsideration and certifying its earlier April 3, 2012 order for interlocutory review. *See* ECF No. 63, Order Re: Interlocutory Appeal (Feb. 14, 2013).  Nevertheless, the Court has jurisdiction over the entirety of the April 3, 2012 order and may, in its discretion, review the class standing question. *City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384, 391-92 (2d Cir. 2008) ("When a district court certifies, pursuant to 28 U.S.C. § 1292(b), a question of controlling law, the entire order is certified and we may assume jurisdiction over the entire order, not merely over the question as framed by the district court."); *see also U.S. v. Stanley*, 483 U.S. 669, 676–77, 107 S.Ct. 3054, 3060 (1987) (28 U.S.C. §1292(b) "brings the 'order,' not the question, before the [appellate] court").

1

would streamline motion practice in other cases involving MBS trustees where the issue is pending.

Interlocutory review is further warranted because there is considerable uncertainty and confusion among the District Courts in this Circuit regarding the extent to which the Court's opinion in *NECA-IBEW* applies to MBS trustee lawsuits, with one District Court rendering an opinion that is in direct conflict with this Court's opinion in *NECA-IBEW*. Resolution of the class standing issue will bring clarity to this and other cases.

## QUESTION PRESENTED

Following this Court's recent decision in *NECA-IBEW*, whether a named plaintiff purchasing a certificate issued by one MBS trust has standing to represent a class which includes purchasers of certificates issued by trusts from which that plaintiff did not purchase, where (1) the action is against a common trustee; and (2) involves repurchase rights for purportedly defective loans issued by a common originator.

## RELIEF SOUGHT

Plaintiffs Retirement Board of the Policemen's Annuity and Benefit Fund of the City of Chicago, Westmoreland County Employee Retirement System, City of Grand Rapids General Retirement System, and City of Grand Rapids Police and Fire Retirement System (collectively, the "Named Plaintiffs") seek immediate

review and reversal of the District Court's order granting in part Bank of New York Mellon's ("BNYM") motion to dismiss and, specifically, its holding that the Named Plaintiffs lacked standing under Article III of the Constitution to assert class-wide claims on behalf of other purchasers of Certificates relating to over 500 Countrywide Trusts at issue in the complaint.

## BACKGROUND

**A.     Nature of the Case.**

### 1.     Securitization of Mortgages and Creation of the Covered Trusts

Mortgage securitization involves the conversion of illiquid whole loans into debt securities, MBS, that trade in capital markets and make principal and interest payments on a fixed schedule. (*E.g.*, ¶27).[2] Here, Countrywide grouped mortgages that it originated or purchased into discrete pools and assigned the pools to different trusts. (¶28). Those trusts were created specifically for the purpose of holding the underlying mortgage loans assigned to them and issuing the MBS, and BNYM, as the Common Trustee for more than 530 Trusts, served as the only independent intermediary between the MBS holders and the various Countrywide affiliates who served as the originators of the loans, the "sellers" of the loans to the

---

[2] All cites to "¶ __" refer to the Verified Class Action and Derivative Complaint ("CAC") (ECF No. 8).

3

Trusts and the Trusts' "master servicer" to protect the MBS holders' interests. (*E.g.*, ¶¶29-33).

The Covered Trusts[3] are all governed by substantially similar agreements, PSAs or Indentures and SSAs. (¶33). Among other things, those agreements set forth representations and warranties by Countrywide concerning the quality of the underlying mortgage loans and the servicing of those mortgages, the Trusts' rights to obtain the substitution or repurchase of mortgage loans which violated these representations and warranties, the duties of BNYM as Trustee, and the structure of the MBS issued by the Covered Trusts. (*E.g.*, ¶¶33-48). A PSA that is representative of the governing agreements is attached as Exhibit C to the CAC.

## 2.    BNYM's Duties as Trustee of the Covered Trusts

As the Trustee of the Covered Trusts, BNYM was supposed to play a critical role in protecting the MBS holders' interests, particularly where, as here, the master servicer, a Countrywide affiliate, defaulted in its obligations to enforce the Trusts' contract rights to put back defective loans to yet another Countrywide affiliate, which had made false representations and warranties when selling the loans, which had been originated by yet another Countrywide affiliate, into the

---

[3] The Covered Trusts are set forth in Exhibits A and B to the CAC.  As BNYM notes in its Memorandum of Law in Support of its Motion to Dismiss (ECF. No. 19), Exhibit A lists the trusts at issue in *The Bank of New York Mellon v. Walnut Place LLC, et al.*, No. 11-cv-5988 (WHP) (S.D.N.Y.), and Exhibit B indicates the trusts from which Plaintiffs purchased MBS, many of which are also listed in Exhibit A.

4

Trusts. The TIA, which was enacted to ensure that trustees like BNYM protect the interests of debt securities holders like Plaintiffs whose ability to protect their own interests are constrained by onerous no-action clauses in the contracts, sets forth certain duties that BNYM was required to fulfill, including:

- to satisfy all of its specified duties under the PSA (¶50);

- to provide Plaintiffs and class members notice of any defaults under the PSA (¶52); and

- in case of an Event of Default, as defined by the PSA, to act as a prudent person would and exercise all of its rights and powers to protect Plaintiffs and class members (¶53).

### 3. BNYM Injured All the Trusts in a Common Way by Failing to Enforce Their Rights Against Countrywide

Countrywide's spectacular failure to properly underwrite and perform its responsibilities in connection with mortgage loans it originated, sold into securitizations, and then managed as the "master servicer," is infamous, yet BNYM has, for years, sat idly by, doing nothing to protect MBS holders, particularly when, unsurprisingly, Countrywide, in its role as master servicer, failed to enforce the Trusts' contract rights to force the repurchase of the defectively originated loans by its affiliate. Even worse, BNYM itself exacerbated the injuries to the MBS holders through its own violations of its pre-default specified contract responsibilities and then, post-default, through its failure to act as a "prudent person" would when faced with those circumstances.

BNYM first breached several duties set forth in the Trust instruments relating to its obligations to obtain, review and certify the form of the mortgage loan documents -- and which then required Countrywide to either cure the problems or repurchase those that did not satisfy their facial requirements. ¶¶67-69.

Second, BNYM failed to act prudently following its discovery of numerous violations of representations and warranties relating to the mortgage loan's origination and underwriting practices. When the Trustee failed to give notice of these defaults and the master servicer failed to cure the defaults by requiring the loans to be repurchased, an "Event of Default" occurred, which, again, required the Trustee to act to protect the Trusts. The loan origination and title defects for the Countrywide mortgage loans, as well as representation and warranty violations, occurred across all the Trusts, and the Trustee failed to protect all these Trusts, by doing nothing, for years, to protect their interests. Particularly, the Trustee:

- failed to assure that the Covered Trusts received perfected title to the mortgage loans;

- failed to assure that the mortgages with title defects were cured, substituted, or repurchased;

- failed to provide required notice to Countrywide and to MBS holders after discovering the defaults; and

- when Countrywide in its role as master servicer failed to force repurchases of the defective loans, failed to take prudent steps to protect MBS holders, including through the timely institution of suit against Countrywide.

BNYM's failures caused Plaintiffs substantial damages. (*E.g.*, ¶¶67-69).

BNYM was aware of these defaults through its own conduct as Trustee, including its involvement in actions like *Kemp*, which held that a Countrywide MBS trust could not foreclose on an underlying mortgage because "upon the sale of the note and mortgage to the Bank of New York [as Trustee], the fact that the note was not properly indorsed to the new owner [BNYM] also defeats the enforceability of the note." (¶58) (quoting *In re Kemp*, 440 B.R. 624, 629-630 (Bankr. D.N.J. 2010)).

BNYM was also aware of these defaults because it prepared the periodic public reports of the Trusts' spiraling losses and through widespread public reporting that Countrywide was systemically making and securitizing shoddy and fraudulent mortgage loans. Most glaring, Countrywide's former Chief Executive, Angelo Mozilo, agreed to a $63 million settlement with the Securities and Exchange Commission ("SEC") regarding Countrywide's false reporting of its systemic underwriting deficiencies. Similarly, various federal and state agencies have announced that Bank of America ("BOA") (and other institutions), systematically failed to follow prudent mortgage servicing guidelines. Multiple private parties, such as MBS holders and MBS insurers, following investigations, have brought well-publicized suits against Countrywide and BOA raising allegations similar to those raised by the SEC and other agencies. (¶68).

**B.    BNYM's "class standing" argument.**

In its motion to dismiss, BNYM argued that the TIA does not apply to the Covered Trusts governed by PSAs. BNYM also raised several arguments in support of its position that it did not violate its duties under the TIA. In addition, BNYM argued that Plaintiffs only have standing to sue for claims relating to the Trusts in which they hold certificates. It is the standing issue that is the subject of the Named Plaintiffs' petition for interlocutory appeal.

Specifically, BNYM argued that the Named Plaintiffs lacked both Article III and "class standing" to assert claims with respect to Certificates relating to Countrywide Trusts they did not own. The District Court agreed. The District Court stated that: "Plaintiffs may not pursue claims relating to securities in which they never invested … Plaintiffs may pursue claims relating only to the twenty-six trusts in which they allege current or former holdings." ECF No. 37, Order on MTD (April 3, 2012), at 6. Following the District Court's order, claims relating to the over 500 Countrywide Trusts were dismissed from this case.

**C.    This Court's opinion in *NECA-IBEW*.**

Following the issuance of the District Court's opinion, this Court rendered its decision in *NECA-IBEW*, 693 F.3d 145 (2d Cir. September 6, 2012). In that case, the plaintiff, NECA, sought to represent purchasers of Certificates issued through 17 Trusts underwritten by defendant Goldman Sachs & Co. and issued by

defendant GS Mortgage Securities Corp. The Certificates at issue were sold in 17 separate offerings pursuant to the same shelf registration statement but using 17 separate prospectus supplements, and were each backed by a distinct set of loans. NECA alleged that the offering documents contained false and misleading representations about the underwriting guidelines of the mortgage loan originators, the property appraisals of the loans, and the risks associated with the Certificates.

According to NECA, the originators falsely inflated (or coached the borrowers to inflate) their income, allowed borrowers to be approved for loans they could not afford under exceptions to the underwriting standards based on so-called "compensating factors" when such "compensating factors" did not exist or did not justify the loans, and ordered appraisers to provide inflated, pre-determined appraisals. However, NECA purchased Certificates issued by just two of the 17 Trusts. Further, with respect to one of these Trusts, the Certificates were divided into two separate Groups, and NECA purchased Certificates from just one of the two Groups.[4]  The District Court granted the defendants' motion to dismiss on the grounds that NECA lacked standing to bring claims, under Sections 11 and 12(a)(2) of the Securities Act of 1933, on behalf of purchasers of Certificates issued by the 15 Trusts from which NECA did not purchase Certificates.

---

[4] Within each offering the Certificates were divided further into separate tranches offering various priorities of entitlement to the loans backing them.

9

According to the District Court, NECA had not shown that the injuries it alleged based upon purchases of Certificates in two of the Trusts were the same as those allegedly suffered by purchasers of Certificates in the other 15 "'outlying trusts backed by distinct sets of loans.'" *Id.* at 154.[5]

In a decision issued on September 6, 2012, this Court reversed the District Court's rulings on standing. This Court began its analysis by distinguishing between Article III standing and class standing. The Court held that plaintiff NECA had Article III standing to sue defendants because "it plausibly alleged (1) a diminution in the value of the . . . Certificates [it purchased] (2) as a result of defendants' inclusion of misleading statements in the . . . registration statements and associated prospectuses that [was] (3) redressable through rights of action for damages under §§11 and 12(a)(2)." *Id.* at 158 (also holding that NECA had statutory standing in its own right under §§11 and 12(a)(2)).

This Court then turned to whether NECA had "class standing – that is, standing to assert claims *on behalf of* purchasers of Certificates from other Offerings, or from different tranches of the same Offering." *Id.* (emphasis in original).[6]  This Court held that Supreme Court jurisprudence "stand[s] collectively

---

[5] In a later ruling, the District Court stated that its ruling on the standing issue was tranche-based, not trust-based, and that NECA could only bring claims on behalf of those persons who purchased Certificates "from the particular tranche from the particular trust" from which the plaintiff purchased its Certificates.  *Id.* at 155.
[6] Emphasis is added, and internal citations and quotation marks omitted, unless otherwise noted.

for the proposition that, in a putative class action, a plaintiff has class standing if he plausibly alleges (1) that he 'personally has suffered some actual . . . injury as a result of the putatively illegal conduct of the defendant,' . . . and (2) that such conduct implicates 'the same set of concerns' as the conduct alleged to have caused injury to other members of the putative class by the same defendants . . . ." *Id.* at 162. Since the misconduct in *NECA-IBEW* was the making of false statements in violation of securities laws, this Court held that whether this misconduct "implicate[d] the same set of concerns for distinct sets of plaintiffs" and, thus, whether NECA had standing to assert claims on behalf of purchasers of Certificates from other tranches and trusts it did not purchase, "depend[ed] on the nature and content of the specific misrepresentation alleged." *Id.*

According to the Court, the fact that the misrepresentations were contained in separate offering documents was not determinative of class standing "because the location of the representations has no effect on a given purchaser's assertion that the representation was misleading (the source of the injury)." *Id.* at 162-63. Instead, the Court focused on the substance of the misconduct at issue, and noted that "proof [of the misconduct] would center on whether the particular originators of the loans backing the particular Offering from which a Certificate-holder purchased a security had in fact abandoned its underwriting guidelines, rendering defendants' Offering Documents false or misleading." *Id.* at 163.

11

Thus the Court held that NECA had class standing to assert claims on behalf of purchasers of Certificates in any of the Offerings that were backed by loans originated by the same lenders as the Certificates purchased by NECA, because its "claims raise a sufficiently similar set of concerns to permit it to purport to represent Certificate-holders from those Offerings." *Id.* at 164.[7] The Court also rejected the defendants' argument for tranche-level standing reasoning that "the Certificates' varying levels of payment priority [did not] raise such a 'fundamentally different set of concerns' as to defeat class standing." *Id.* (quoting *Gratz v. Bollinger*, 539 U.S. 244, 264 (2003)).

## REASONS FOR PERMITTING THE APPEAL

**A.    The standard for an interlocutory appeal is satisfied.**

The standard for granting a petition for interlocutory review under Section 1292(b) is well established. This Court has explained that: "To warrant [] granting leave to appeal pursuant to [Section 1292(b)], (a) the appeal must concern a question 'of law,' (b) that question must be one that is 'controlling,' and (c) that controlling question of law must be one 'as to which there is a substantial ground for difference of opinion.'" *Casey v. Long Island R.R. Co.,* 406 F.3d 142, 146 (2d

---

[7] This Court held that NECA had standing to bring claims on behalf of purchasers of Certificates issued by five additional Trusts in addition to the two Trusts from which it purchased its Certificates. *Id.* at 164. With respect to the Trust divided into two separate Groups, the Court held that NECA had standing to assert claims on behalf of purchasers of Certificates issued by both Groups since Wells Fargo originated at least some loans in each Group. *Id.*

Cir. 2005) (quoting 28 U.S.C. §1292(b)). This Court regularly grants petitions for interlocutory review when this standard is satisfied, as it is here.[8]

### 1.    The interlocutory appeal concerns a "pure" question of law.

There is no question that the class standing question presents a "pure question of law" that this Court can "decide quickly and cleanly," without the need to "immers[e]" itself in a "detailed" record. *Ahrenholz v. Bd. of Trustees of Univ. of Ill.*, 219 F.3d 674, 677 (7th Cir. 2000); *see also Weber v. U.S.*, 484 F.3d 154, 159 (2d Cir. 2007) (recognizing that Congress enacted Section 1292(b) in part to "assure the prompt resolution of knotty *legal* problems."); *McFarlin v. Conseco Services, LLC*, 381 F.3d 1251, 1259 (11th Cir. 2004) (explaining that "legal question must be stated at a high enough level of abstraction to lift the question out of the details of the evidence or facts of a particular case and give it general relevance to other cases in the same area of law."). In this case, the Court need only decide whether, as a pure question of law, its recent opinion in *NECA-IBEW* is applicable to the facts alleged in the Named Plaintiffs' complaint.

As noted above, this Court in *NECA-IBEW* held that the named plaintiff in that case had plausibly alleged class standing to assert claims on behalf of MBS Holders who purchased certificates tied to other trusts because the named plaintiff:

---

[8] *See, e.g.*, *NML Capital, Ltd. v. Banco Central de la Republica Argentina*, 652 F.3d 172 (2d Cir. 2011); *Doninger v. Niehoff*, 642 F.3d 334 (2d Cir. 2011); *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111 (2d Cir. 2010); *Murray v. Metro. Life Ins. Co.*, 583 F.3d 173 (2d Cir. 2009).

(1) "personally [had] suffered some actual … injury as a result of the putatively illegal conduct of the defendant," and (2) "such conduct implicate[d] 'the same set of concerns' as the conduct alleged to have caused injury to other members of the putative class by the same defendants." 693 F.3d at 162. The Court went on to hold that "the same set of concerns" were implicated where the named plaintiffs and the class members purchased certificates from Trusts that contained mortgage loans issued by the ***same originators***. *Id.* at 164 ("[T]o the extent certain Offerings were backed by loans originated by originators common to those [] Offerings, NECA's claims raise a sufficiently similar set of concerns to permit it to purport to represent Certificate-holders from those Offerings.").

This analysis applies with equal force here. Indeed, one need only examine the settlement documents from the $8.5 billion settlement between Bank of America, Countrywide, BNYM and MBS Holders in the same 530 Countrywide Trusts that are at issue in the present case to see that the "same set of concerns" are implicated across all 530 of the Countrywide Trusts. *See* Docket No. 1-1, *The Bank of New York Mellon v. Walnut Place LLC, et al.,* Case No. 1:11-cv-05988-WHP (S.D.N.Y.).[9]  In the verified petition in support of the settlement, BNYM, in its capacity as the trustee for the 530 Countrywide Trusts, conceded that:

---

[9] This Court can take judicial notice of the verified petition that BNYM filed in support of the $8.5 billion settlement.  *See, e.g.*, *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d

The [530] Trusts were established during the period 2004-2008 through a process known as securitization …. Although the Governing Agreements for each of these securitizations are separate agreements that were individually negotiated and, in some instances, display degrees of variation from one another, ***the terms that are pertinent to the subject matter of the Petition are substantively similar***. ***The Governing Agreements each contain a series of representations and warranties made by each Seller for the benefit of the Trust.*** These include representations that the Mortgage Loans were underwritten in all material respects in accordance with underwriting guidelines; that the origination, underwriting and collection practices of the Seller and Master Servicer have been legal, prudent and customary in the mortgage lending and servicing business; that the Mortgage Loans conform in all material respects to their descriptions in the investor disclosure documents; and that the Mortgage Loans were originated in accordance with all applicable laws.

*Id.* at 2-3.

BNYM also conceded in the settlement papers that "[***t]he representations and warranties of the Seller – Countrywide – are at the core of this matter***" and that "***Countrywide's representations and warranties are, in all material respects, similar across all of the Governing Agreements***." *Id.* at 9-10.[10]   And BNYM stated in the settlement papers that losses to the 530 Countrywide Trusts could be calculated using a common methodology. *Id.* at 13-14. Thus, the Named Plaintiffs have "class standing" to assert claims on behalf of MBS holders in the over 500

---

Cir. 2008) (courts may take judicial notice of court filings to establish that certain matters have been publicly asserted); *see, e.g.*, *In re F.C.C.*, 208 F.3d 137, 138 (2d Cir. 2000) (same).

[10] BNYM went on to state in the settlement papers that: Countrywide represented and warranted, among other things, that the specific Countrywide representations that were "at the core of [the] matter" included representations and warranties relating to: "The origination, underwriting and ollection practices used ***by Countrywide*** with respect to each Mortgage Loan have been in all respects legal, prudent and customary in the mortgage lending and servicing business." *Id.* at 9.

Countrywide Trusts because, as BNYM has already conceded, the governing agreements are substantially similar across all of the Countrywide Trusts and it is Countrywide's false representations and warranties that are at the core of the matter with respect to each and every one of the 530 Trusts.

This Court's test for establishing "class standing" is further satisfied because, in the present case, the focus is on BNYM's conduct as Trustee for the 530 Countrywide Trusts. Indeed, in their complaint, the Named Plaintiffs have alleged that they have been injured by BNYM's failure to cure, substitute and/or repurchase defective loans in the Trusts that were originated in violation of the originator's stated loan underwriting guidelines. This is the same conduct that injured MBS holders who purchased Certificates linked to the over 500 Countrywide Trusts. Accordingly, as in *NECA-IBEW*, proof of Class members' injuries in this case will center on whether Countrywide complied with the underwriting guidelines in originating the loans in the Trusts, as well as whether BNYM complied with its obligations as Trustee to put back defective loans.

The certification that BNYM must provide to comply with SEC Regulation AB also shows that this Court's test for establishing "class standing" is satisfied with respect to all 530 of the Countrywide Trusts. In the certification, BNYM represented that it had complied with the servicing criteria specified in Item 1122(a) of Regulation AB for the entire "platform" of residential mortgage backed

16

securities for which BNYM served as Trustee. Specifically, BNYM certified that: "With respect to the applicable servicing criterion 1122(d)(2)(iii) there were no activities performed during the period with respect to the **Platform**, because there were no occurrences of events that would require the Company to perform such activities." The certification goes on to define the applicable "platform" as all residential mortgage backed securities issued during the calendar year for which BNYM served as Trustee. Thus, when it came to certifying that it had complied with the applicable servicing criterion, BNYM did not single out any of the 530 Countywide Trusts, but certified that it had complied with Regulation AB across the entire platform.

In sum, this petition involves a "pure" question of law – namely, whether this Court's recent opinion in *NECA-IBEW* confers "class standing" upon the Named Plaintiffs so that they can assert claims on behalf of MBS holders in the other Countrywide Trusts that the District Court dismissed from this case.

### 2.   The class standing question qualifies as "controlling."

The class standing question also qualifies as a "controlling" question of law – as that term has been defined by this Court – because resolution of the question: (1) would importantly affect the course of the litigation going forward; (2) would remove the cloud of legal uncertainty that currently hangs over the over 500 Countrywide Trusts at issue in the case; (3) may hasten the termination of this

17

litigation through settlement; and (4) would streamline motion practice in other cases involving MBS trustees where the issue is currently pending.

This Court has recognized that "resolution of an issue need not necessarily terminate an action in order to be 'controlling'" under Section 1292(b). *Klinghoffer v. S.N.C. Achille Lauro,* 921 F.2d 21, 24 (2d Cir. 1990). Rather, immediate interlocutory review is appropriate if the issue is one "that may importantly affect the conduct of [the] action." *In re Duplan Corp.,* 591 F.2d 139, 148 n. 11 (2d Cir. 1978). This Court has also explained that it will consider "system-wide costs and benefits" when determining whether to permit interlocutory review. *Klinghoffer*, 921 F.2d at 24.

Here, the issues concerning whether or not over 500 Countrywide Trusts are properly part of this action is an issue about which there is tremendous legal uncertainty. As the parties move forward, they will be in a far better position to assess the true scope of this case if they are able to get clarity and certainty on the class standing issue. Resolution of the class standing issue on interlocutory appeal will also bring clarity to the parties' respective bargaining positions and may lead to early termination of this suit through settlement. Finally, and perhaps most important of all, resolution of the class standing issue will provide clarity and streamline motion practice in this and other residential mortgage backed securities trustee cases that are currently pending in this Circuit.

### 3.    There are substantial grounds for differences of opinion.

The remaining prong of Section 1292(b), which requires a finding that the issue presented for interlocutory appeal is one about which there are "substantial grounds for difference of opinion," is also easily satisfied. There is no question that there is considerable uncertainty and confusion among the District Courts in this Circuit regarding the application of the *NECA-IBEW* case to the facts and circumstances alleged in cases that MBS holders have brought against trustees. The recent opinion in *Policemen's Annuity and Benefit Fund of the City of Chicago v. Bank of America, NA, et al.,* Case No. 1:12-cv-02865 (S.D.N.Y. Dec. 7, 2012) is highly illustrative on this point. There, the District Court held that the named plaintiff only had "class standing" as to the five Trusts in which it purchased certificates, and could not represent MBS holders who purchased certificates relating to other trusts. *Id.*

Importantly, the District Court rendered its opinion in the *Bank of America* case ***after*** this Court rendered its opinion in *NECA-IBEW*. The District Court in *Bank of America* held that the named plaintiffs lacked "class standing" to assert claims on behalf of MBS holders in other trusts because "[e]ach Trust is backed by a group of mortgage loans and, critically, the set of loans underlying each Trust is unique – *i.e.,* each loan is only "in" (or "backs the MBS of") one Trust." *Id.* at 15. The District Court went on: "The value of a particular certificate is tied to the

19

mortgage loans underlying the trust that issued the certificate …. Thus, to the extent that the Trustee breached its duties and such breach can be found to have caused a diminution in the value of a trust's MBS, there is no indication that the alleged breach would 'infect' the value of MBS from any other Trust and vice-versa." *Id.* at 15-16.

The District Court's reasoning in *Bank of America* conflicts with the logic that this Court employed in *NECA-IBEW*, when it held that the named plaintiff had class standing to assert claims on behalf of MBS holders in other certificates that were backed by other trusts. *See, e.g.*, 693 F.3d at 164 (explaining that "[T]o the extent certain offerings were backed by loans originated by originators common to those backing [other] Offerings, NECA's claims raise a sufficiently similar set of concerns to permit it to purport to represent Certificate-holders from those Offerings."). Thus, this Court should exercise interlocutory review of the District Court's order in this case to resolve the uncertainty and confusion that is present in this Circuit regarding the Court's holding in the *NECA-IBEW* case.

## **CONCLUSION**

For the foregoing reasons, this Court should grant the Named Plaintiffs' petition for interlocutory review in its entirety.

20

Respectfully submitted,


/s/ Beth A. Kaswan

BETH A. KASWAN
SCOTT+SCOTT,
ATTORNEYS AT LAW, LLP
*Attorneys for Plaintiffs-Petitioners*
The Chrysler Building
405 Lexington Avenue, 40th Floor
New York, New York 10174
(212) 223-6444

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
                       :

RETIREMENT BOARD OF THE                  11 Civ. 5459 (WHP)
POLICEMEN'S ANNUITY AND       :
BENEFIT FUND OF THE CITY          MEMORANDUM & ORDER
OF CHICAGO, *et al.*,           :

         Plaintiffs,        :

      -against-          :

THE BANK OF NEW YORK MELLON,  :

       Defendant.     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #:
> DATE FILED: 2/14/13

WILLIAM H. PAULEY III, District Judge:

        The Bank of New York Mellon ("BNYM") moves for reconsideration of this

Court's Memorandum & Order dated April 3, 2012 (the "April 3 Order") granting BNYM's

motion to dismiss the complaint in part and denying it in part. In the alternative, BNYM moves

to certify the April 3 Order for interlocutory appeal. For the following reasons, BNYM's motion

for reconsideration is denied, but this Court certifies the April 3 Order for interlocutory appeal.

BACKGROUND

I.    Factual Background

        The April 3 Order sets forth the allegations underlying this action. See Ret. Bd.

of the Policemen's Annuity & Benefit Fund of Chi. v. Bank of N.Y. Mellon, ---F. Supp. 2d----,

2012 WL 1108533, at *1-*2 (S.D.N.Y. 2012). To summarize, Plaintiffs own mortgage-backed

securities for which BNYM serves as trustee. They allege that BNYM violated the Trust

Indenture Act of 1939, 15 U.S.C. § 77aaa, et seq. (the "TIA") and breached its contractual and

fiduciary duties.

More specifically, Plaintiffs hold securities issued by twenty-five New York trusts and one Delaware trust. (Class Action and Derivative Complaint, dated Aug. 31, 2011 ("Compl.") Ex. B.) BNYM is trustee for the New York trusts and Countrywide (now Bank of America) is the "master servicer." (Compl. ¶¶ 1, 15, 96 n. 2.) The terms of the New York trusts as well as the rights, duties, and obligations of the trustee and the master servicer are set forth in Pooling and Servicing Agreements ("PSAs"). (Compl. ¶ 2; Compl. Ex. C: Pooling and Servicing Agreement dated Sept. 1, 2006.) The PSAs also govern the trustee's distribution of money to certificateholders. (Compl.¶¶ 1, 2.) The Delaware trust operates similarly, with a few key differences. The Delaware trust issued notes, subject to an indenture, for which BNYM serves as indenture trustee. (Declaration of Matthew D. Ingber, dated Dec. 16, 2011 ("Ingber Decl.") Ex A: Indenture, dated Mar. 30, 2006 § 3.04, Annex 1 (Glossary).) Concurrently, the Delaware trust entered into a Sale and Servicing Agreement ("SSA") with Countrywide (now Bank of America) governing the sale of the underlying mortgage loans and the master servicer's responsibilities. (Ingber Decl. Ex. B: Sale and Servicing Agreement, dated Mar. 30, 2006.)

II.     Procedural Background

On its motion to dismiss, BNYM conceded that the mortgage-backed notes issued by the Delaware trust are debt securities to which the TIA applies. BNYM contended, however, that the certificates issued by the twenty-five New York trusts are equity securities exempt from the TIA under section 304(a)(1). BNYM relied heavily on several treatises to support its position. BNYM also argued that the structure of the New York certificates closely resembles equity. BNYM did not invoke any TIA exemption other than section 304(a)(1). Specifically, BNYM did not contend that the New York certificates were exempt under section 304(a)(2) as

2

"certificates of interest or participation in two or more securities having substantially different rights and privileges[.]" 15 U.S.C. § 77ddd(a)(2).

In its reply brief in support of its motion to dismiss, BNYM mentioned in passing that the United States Securities and Exchange Commission (the "SEC") agreed that the New York certificates were TIA-exempt and cited informal guidance published on the SEC's website. BNYM failed to observe, however, that the SEC relied on section 304(a)(2) of the TIA, and not section 304(a)(1). Rather, BNYM simply pointed the Court to the SEC's website and argued that the SEC's guidance "merit[s] some deference." United States v. Mead Corp., 533 U.S. 218, 234 (2001).

After this Court issued the April 3 Order, BNYM moved for reconsideration and advanced several new theories. The Court also received several amicus curiae submissions supporting BNYM's motion for reconsideration. For the most part, these submissions raise policy-based objections to the April 3 Order and do not address in any detail the issues of statutory interpretation at the heart of this motion. And "this [C]ourt knows the difference between a friend of the court and a friend of one of the litigants." SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC, 407 F. Supp. 2d 587, 590 (S.D.N.Y. 2006) (Mukasey, J.). When amici that are "aligned with one who has interest in the outcome of a case" submit briefs "in direct response to an opinion of this [C]ourt that is adverse to that interest," their arguments "will have to stand or fall not on the purported authority of [their] source but solely on [their] own internal logic." SR Int'l, 407 F. Supp. 2d at 590. Further, "[e]verything [BNYM and its amici have] submitted on this motion should have been before the Court earlier, which is more than sufficient

3

reason to deny its motion as an unwarranted imposition on the Court and, indeed, its adversary." Bridgeman Art Library, Ltd. v. Corel Corp., 36 F. Supp. 2d 191, 192 (S.D.N.Y. 1999).

DISCUSSION

I.    Legal Standard

    BNYM purports to seek reconsideration of the April 3 Order under Federal Rules of Civil Procedure 59 and 60 and Local Rule 6.3.  But because the April 3 Order is not a "judgment" or "final judgment," neither Rule 59(e) nor Rule 60(b) applies.  In re Palermo, No. 08 Civ. 7421 (RPP), 2011 WL 446209, at *4 (S.D.N.Y. Feb. 7, 2011); see also Floyd v. City of New York, 813 F. Supp. 2d 457, 464 (S.D.N.Y. 2011) ("Because that decision did not fully adjudicate the parties' claims, it was not appealable and thus not final for the purposes of Rule 60(b).").  Rather, "the only ground available for [BNYM] to move for reconsideration is under Local Civil Rule 6.3." In re Palermo, 2011 WL 446209, at *4.

    A motion for reconsideration under Local Civil Rule 6.3 "will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked— matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995).  "It is implicit in this language that a motion for reconsideration cannot assert new arguments or claims which were not before the court on the original motion and consequently cannot be said to have been considered." Koehler v. Bank of Bermuda, Ltd., No. M18-302 (CSH), 2005 WL 1119371, at *1 (S.D.N.Y. May 10, 2005) (emphasis in original).  In other words, "Rule 6.3 is intended to 'ensure the finality of decisions and to prevent the practice of a losing party examining a decision then plugging the gaps of a lost motion with additional matters.'" SEC v. Ashbury Capital Partners,

4

L.P., No. 00 Civ. 7898 (RCC), 2001 WL 604044, at *1 (S.D.N.Y. May 31, 2001) (quoting

Carolco Pictures, Inc. v. Sirota, 700 F. Supp. 169, 170 (S.D.N.Y. 1988)). Reconsideration is not

an invitation for parties to "treat the court's initial decision as the opening of a dialogue in which

that party may then use such a motion to advance new theories or adduce new evidence in

response to the court's rulings." De Los Santos v. Fingerson, No. 97 Civ. 3972 (MBM), 1998

WL 788781, at *1 (S.D.N.Y. Nov. 12, 1998). "The standard is strict and the decision is within

the sound discretion of the district court." Robbins v. H.H. Brown Shoe Co., No. 08 Civ. 6885

(WHP) 2009 WL 2496024, at *1 (S.D.N.Y. July 22, 2009) (internal quotation marks omitted).

II.     Applicability of the TIA

    A.    Section 304(a)(1)

        BNYM contends that this Court overlooked certain legal and factual issues in

denying its motion to dismiss Plaintiffs' TIA claims regarding the New York certificates. As in

its original moving papers, BNYM asserts that the New York certificates are exempt from the

TIA because they are equity securities. However, BNYM points to no controlling legal

authorities or factual matters that this Court overlooked. Rather, BNYM argues that this Court

improperly rested its conclusion on an application of the factors that the IRS considers in

differentiating debt securities from equity securities. See TIFD III-E, Inc. v. United States, 459

F.3d 220, 235 n.15 (2d Cir. 2006) (quoting IRS Notice 94-47, 1994-19 I.R.B. 9 (Apr. 18, 1994)).

        But this Court did not rely exclusively on those factors. Rather, this Court

concluded that the New York certificates more closely resembled debt than equity and observed

that many courts have characterized mortgage-backed securities similar to the New York

certificates as "debt." See, e.g., LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp., 424

F.3d 195, 200 (2d Cir. 2005); <u>CWCapital Asset Mgmt., LLC v. Chi. Props., LLC</u>, 610 F.3d 497, 499 (7th Cir. 2010) (Posner, J.); <u>Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.</u>, 837 F. Supp. 2d 162, 182 (S.D.N.Y. 2011) ("[A]s many courts have observed, pass-through certificates are structurally similar in form and function to bonds issued under an indenture."); <u>In re Sec. Capital Assurance Ltd. Sec. Litig.</u>, 729 F. Supp. 2d 569, 575 (S.D.N.Y. 2010) (referring to certificates in residential mortgage-backed securities as "debt securities"); <u>Trust for Certificate Holders of Merrill Lynch Mortg. Passthrough Certificates Series 1999-C1 v. Love Funding Corp.</u>, No. 04 Civ. 9890 (SAS), 2005 WL 2582177, at *1 (S.D.N.Y. Oct. 11, 2005) ("These certificates are essentially bonds secured by a pool of commercial mortgages that the Trust has purchased from lenders."). To the extent that BNYM challenges this Court's reliance on these decisions, it merely repeats arguments that this Court previously considered and rejected.

BNYM also argues that the New York certificates should not be characterized as debt because they do not reflect an unconditional promise to pay a sum certain. According to BNYM, such an obligation is absent because the duty to pay is contingent on the mortgagors' making their principal and interest payments. But this argument is unavailing, as "crediting it would ignore that the obligation to pay certificate-holders <u>always</u> exists; that obligation, however, cannot be <u>met</u> if individual mortgagors default on their principal and interest payments." <u>Policemen's Annuity & Benefit Fund of Chi. v. Bank of Am., NA</u>, ---F. Supp. 2d----, 2012 WL 6062544, at *16 (S.D.N.Y. 2012) (emphasis in original).

Finally, BNYM and its <u>amici</u> cite, <u>inter alia</u>, an SEC no-action letter from 1988 and Department of Labor guidance from 1996 for the proposition that the New York certificates are equity securities. But these agency pronouncements are not "controlling," and this Court did

6

not overlook them. See Ivan Visin Shipping, Ltd. v. Onego Shipping & Chartering B.V., 543 F.

Supp. 2d 338, 339 (S.D.N.Y. 2008) ("Controlling authority means decisions of the Second

Circuit Court of Appeals or the U.S. Supreme Court[.]" (citation omitted)). In any event, these

informal agency pronouncements are entitled only to "respect proportional to [their] 'power to

persuade[.]'" Mead, 533 U.S. at 235 (quoting Skidmore v. Swift & Co., 323 U.S. 134, 140

(1944)). And the cursory agency pronouncements on which BNYM and its amici rely lack

persuasive power. Accordingly, this Court declines to reconsider its conclusion that the New

York certificates are debt securities to which the TIA applies.

    B. Section 304(a)(2)

        BNYM also argues—for the first time—that the New York certificates are exempt

under section 304(a)(2) of the TIA because they are "certificates of interest or participation in

two or more securities having substantially different rights and privileges[.]" 15 U.S.C. §

77ddd(a)(2). But it cites no controlling law that this Court overlooked in reaching the opposite

conclusion. To the contrary, BNYM supports its argument with a citation to a single district

court opinion from the Eastern District of Pennsylvania. See Lavin v. Data Sys. Analysts, Inc.,

443 F. Supp. 104, 109 (E.D. Pa. 1977). Besides the obvious fact that Lavin is not "controlling,"

that opinion does not address section 304(a)(2) at all. More fundamentally, "[a] motion for

reconsideration is not an opportunity for making new arguments that could have been previously

advanced, nor is it a substitute for appeal." In re Optimal U.S. Litig., 813 F. Supp. 2d 383, 387

(S.D.N.Y 2011) (internal quotation marks and footnotes omitted). Accordingly, this Court

declines to consider new arguments for dismissal that BNYM failed to raise in its original briefs.

BNYM also contends that this Court did not afford adequate deference to the conclusory statements regarding section 304(a)(2) on the SEC's website. In the April 3 Order, this Court declined to grant Skidmore deference to these statements. According to BNYM, however, the SEC statements merit heightened deference because they are "generally applicable," Estate of Landers v. Leavitt, 545 F.3d 98, 110 (2d Cir. 2008), and the TIA is part of "a large and complex regulatory scheme[.]" Cmty. Health Ctr. v. Wilson-Coker, 311 F.3d 132, 138 (2d Cir. 2002). BNYM also observes that the Second Circuit has afforded Skidmore deference to positions adopted by the SEC in an amicus brief. See In re New Times Sec. Servs., Inc., 371 F.3d 68, 82-83 (2d Cir. 2004). But an agency's amicus brief stands on a far different footing than unattributed statements on a website. An SEC amicus brief reflects the considered views of the Commission. See 17 C.F.R. § 200.21(a). By contrast, the SEC Division of Corporate Finance expressly cautions that the interpretations on its website "are not rules, regulations, or statements of the Commission" and that "the Commission has neither approved nor disapproved these interpretations." Division of Corporate Finance, Compliance and Disclosure Interpretations, http://www.sec.gov/divisions/corpfin/cfguidance.shtml (last visited Feb. 14, 2013). Moreover, that SEC website now states that "the staff is considering [its position] in light of" the April 3 Order. Trust Indenture Act of 1939, Questions and Answers of General Applicability, http://www.sec.gov/divisions/corpfin/guidance/tiainterp.htm (last visited Feb. 14, 2013).

In any event, BNYM asserts these arguments for the first time in support of its motion for reconsideration. At the motion to dismiss stage, BNYM cited the SEC website only in its reply brief and asserted that the statements deserved "some deference." Mead, 533 U.S. at

234. As this Court concluded in the April 3 Order, the conclusory statements on the SEC's website are "beyond the <u>Chevron</u> pale." <u>Mead</u>, 533 U.S. at 234. And this Court rejects BNYM's attempt to advance novel theories on reconsideration. <u>See In re Optimal</u>, 813 F. Supp. 2d at 387.

III.    Events of Default Under the <u>Delaware Indenture</u>

         BNYM also seeks reconsideration of this Court's conclusion that Plaintiffs adequately alleged "events of default" under the Delaware Indenture. But, again, BNYM points to no "controlling decisions or data that the court overlooked[.]" <u>Shrader</u>, 70 F.3d at 257. Rather, BNYM relitigates questions that this Court already resolved and attempts to introduce new theories for dismissal. To the extent BNYM contends that Plaintiffs failed to allege that the "issuer"—as opposed to the "master servicer"—had any relevant duties, its cramped reading of Plaintiffs' allegations reflects a misunderstanding of the Rule 12(b)(6) standard. <u>See Anderson News, L.L.C. v. Am. Media, Inc.</u>, 680 F.3d 162, 185 (2d Cir. 2012) (on a motion to dismiss, courts "accept as true the factual allegations of the complaint, and construe all reasonable inferences that can be drawn from the complaint in the light most favorable to the plaintiff" (internal quotation marks and citation omitted)). And this Court declines BNYM's invitation to disregard the "strict" standard for reconsideration. <u>Shrader</u>, 70 F.3d at 257. Accordingly, BNYM's motion for reconsideration is denied.

IV.    Interlocutory Appeal

         Alternatively, BNYM requests that this Court certify the April 3 Order for interlocutory appeal. A district court may certify an order for interlocutory appeal if "the district judge 'is of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal may materially

9

advance the ultimate termination of the litigation.'" United States v. Culbertson, 598 F.3d 40, 45 (2d Cir. 2010) (quoting 28 U.S.C. § 1292(b)).

   The question whether the TIA applies to the New York certificates is controlling because reversal of the April 3 Order, "even though not resulting in dismissal, could significantly affect the conduct of the action[.]" Primavera Familienstifung v. Askin, 139 F. Supp. 2d 567, 570 (S.D.N.Y. 2001). Further, the applicability of the TIA to the New York certificates raises "novel and complex" issues that could impact a large number of cases. In re Currency Conversion Fee Antitrust Litig., No. M 21-95, 2005 WL 1871012, at *3 (S.D.N.Y. Aug. 9, 2005). Another court in this District recently held that the TIA applies to mortgage-backed securities similar to those at issue here. See Bank of Am., 2012 WL 6062544, at *16. But BNYM and its amici advance arguments for reconsideration that—while beyond the scope permitted by Local Civil Rule 6.3—underscore the existence of substantial grounds for difference of opinion. In short, the applicability of the TIA to mortgage-backed securities remains unsettled, contributing to industry uncertainty.

   While this action will continue irrespective of any ruling by the Court of Appeals, it may be considerably streamlined if the claims involving the twenty-five New York trusts are dismissed. Under these circumstances, the prompt resolution of this issue on appeal may materially advance the termination of this litigation. See Transp. Workers Union, Local 100 v. N.Y.C. Transit Auth., 358 F. Supp. 2d 347, 350 (S.D.N.Y. 2005) ("An immediate appeal is considered to advance the ultimate termination of the litigation if that appeal promises to advance the time for trial or to shorten the time required for trial.") (internal footnote and

quotation marks omitted).  Accordingly, this Court certifies the April 3 Order for interlocutory appeal.

## CONCLUSION

For the foregoing reasons, BNYM's motion for reconsideration is denied. Further, this Court certifies its Memorandum & Order dated April 3, 2012 for interlocutory appeal under 28 U.S.C. § 1292(b).  Any party seeking leave for the Court of Appeals to hear an interlocutory appeal shall direct its application to the Court of Appeals within ten days.  See 28 U.S.C. 1292(b).   The Clerk of Court is directed to terminate the motion pending at ECF No. 38.

Dated: February 14, 2013
       New York, New York

SO ORDERED:

WILLIAM H. PAULEY III
U.S.D.J.

*Counsel of Record:*

David R. Scott, Esq.
Beth A. Kaswan, Esq.
Deborah Clark-Weintraub, Esq.
Joseph P. Guglielmo, Esq.
Max R. Schwartz, Esq.
Scott & Scott, LLP
500 Fifth Avenue, 40th floor
New York, NY 10110

Anne L. Box, Esq.
Scott & Scott, LLP
707 Broadway, Suite 1000
San Diego, CA 92101

Geoffrey M. Johnson, Esq.
Scott & Scott, LLP
12434 Cedar Road, Suite 12
Cleveland Heights, OH 44106
*Counsel for Plaintiffs*

Matthew D. Ingber, Esq.
Paula G. Lin, Esq.
Christopher J. Houpt, Esq.
Mayer Brown LLP
1675 Broadway
New York, NY 10019
*Counsel for Defendant*

STATE OF NEW YORK      )
                       )        ss.:        **AFFIDAVIT OF**
COUNTY OF NEW YORK     )                    **PERSONAL SERVICE**

**TYRONE HEATH**
**2304 CROTONA AVE. APT. #1B**
**BRONX, NY 10458** , being duly sworn, depose and say that deponent is not a
party to the action, is over 18 years of age and resides at the address shown above or at

On          **FEB 25 2013**

deponent served the within: **Petition for Interlocutory Appeal**

        upon:

**Mayer Brown LLP**
**Matthew D. Ingber**
**Paula Garrett Lin**
**Christopher J. Houpt**
**1675 Broadway**
**New York, New York 10019**
**Tel: (212) 506-2373**
**Fax: (212) 262-1910**
**minger@mayerbrown.com**
**plin@mayerbrown.com**
**choupt@mayerbrown.com**

**Counsel for Defendant-Respondent**


the attorney(s) in this action by delivering  **1**  true copy(ies) thereof to said individual
personally.  Deponent knew the person so served to be the person mentioned and
described in said papers as the Attorney(s) herein.

In addition, Petition was served electronically, via e-mail.

Sworn to before me on          **FEB 25 2013**

*Mariane Braylovs*
  **Mariana Braylovskaya**
Notary Public State of New York
     No. 01BR6004935
  Qualified in Richmond County
Commission Expires March 30, 2014

Job # 246143