**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**
Thurgood Marshall U.S. Courthouse    40 Foley Square, New York, NY 10007 Telephone: 212-857-8500

**MOTION INFORMATION STATEMENT**

Docket Number(s): _____    Caption [use short title]

Motion for: Leave to appeal, pursuant to 1292(b)

Set forth below precise, complete statement of relief sought:

The Bank of New York Mellon respectfully requests

that this Court accept for interlocutory appeal

an Order of the district court which it certified

pursuant to 28 U.S.C. 1292(b).

Retirement Board of the Policemen's Annuity and Benefit Fund of the City of Chicago, et al v. The Bank of New York Mellon

MOVING PARTY: Bank of New York Mellon    OPPOSING PARTY: Retirement Board, et al
☐ Plaintiff    ☑ Defendant
☐ Appellant/Petitioner    ☐ Appellee/Respondent

MOVING ATTORNEY: Charles A. Rothfeld    OPPOSING ATTORNEY: Beth Kaswan
[name of attorney, with firm, address, phone number and e-mail]

Mayer Brown LLP    Scott + Scott LLP
1999 K St. NW; Washington, D.C. 20006    500 Fifth Ave. 40th Floor; New York, NY 10110
crothfeld@mayerbrown.com    bkaswan@scott-scott.com
(202) 263-3000    (212) 223-6444

Court-Judge/Agency appealed from: United States District Court for the Southern District of New York

Please check appropriate boxes:

Has movant notified opposing counsel (required by Local Rule 27.1):
☑ Yes ☐ No (explain): _____

Opposing counsel's position on motion:
☐ Unopposed ☑ Opposed ☐ Don't Know
Does opposing counsel intend to file a response:
☑ Yes ☐ No ☐ Don't Know

Is oral argument on motion requested? ☑ Yes ☐ No (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set? ☐ Yes ☑ No If yes, enter date: _____

**FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUNCTIONS PENDING APPEAL:**

Has request for relief been made below?    ☐ Yes ☐ No
Has this relief been previously sought in this Court?    ☐ Yes ☐ No
Requested return date and explanation of emergency: _____

Signature of Moving Attorney:
/s/ Charles A. Rothfeld    Date: 2/25/2013    Service by: ☐ CM/ECF    ☑ Other [Attach proof of service]

---

**ORDER**

**IT IS HEREBY ORDERED THAT** the motion is **GRANTED  DENIED**.

**FOR THE COURT:**
CATHERINE O'HAGAN WOLFE, Clerk of Court

Date: _____    By: _____

**Form T-1080** (rev. 7-12)

# 13-_____

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆●◆

RETIREMENT BOARD OF THE POLICEMEN'S ANNUITY AND BENEFIT FUND OF THE CITY OF CHICAGO, WESTMORELAND COUNTY EMPLOYEE RETIREMENT SYSTEM, CITY OF GRAND RAPIDS GENERAL RETIREMENT SYSTEM, and CITY OF GRAND RAPIDS POLICE AND FIRE RETIREMENT SYSTEM (on Behalf of Themselves and Similarly Situated Certificate Holders),

*Plaintiffs-Respondents,*

—against—

THE BANK OF NEW YORK MELLON
(as Trustee Under Various Pooling and Servicing Agreements),

*Defendant-Petitioner.*

_____

ON PETITION FOR INTERLOCUTORY APPEAL FROM AN ORDER OF THE
UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

WILLIAM H. PAULEY III, DISTRICT JUDGE
CASE NO. 1:11-CV-5459

## PETITION FOR PERMISSION FOR LEAVE TO FILE INTERLOCUTORY APPEAL

CHARLES A. ROTHFELD
PAUL W. HUGHES
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3000

MATTHEW D. INGBER
CHRISTOPHER J. HOUPT
MAYER BROWN LLP
1675 Broadway
New York, New York 10019
(212) 506-2500

*Attorneys for Defendant-Petitioner*

## CORPORATE DISCLOSURE STATEMENT

The Bank of New York Mellon ("BNYM") is a wholly owned subsidiary of The Bank of New York Mellon Corp., a Delaware corporation, which is a publicly held company. No publicly held company owns 10% or more of The Bank of New York Mellon Corp.'s stock.

# TABLE OF CONTENTS

Corporate Disclosure Statement ..................................................... i

Table of Authorities ................................................................. iii

Introduction .......................................................................... 1

Question Presented .................................................................... 3

Relief Sought ......................................................................... 3

Background ............................................................................ 3

Reasons for Permitting the Appeal ..................................................... 6

    A. The criteria for an interlocutory appeal are satisfied. ......................... 7

        1. The issue presented is a controlling question of law. .................. 7

        2. The order is contestable. ............................................. 8

    B. Whether the TIA applies to trusts governed by a PSA is a matter of tremendous practical importance. ..................................... 16

Conclusion ........................................................................... 19


Appendix A – Order of April 3, 2012 ................................................. A1

Appendix B – Order issuing Section 1292(b) certification ........................... A20

Appendix C – List of securitizations ............................................... A32

# TABLE OF AUTHORITIES

## Cases

*Ahrenholz v. Bd. of Trustees of Univ. of Ill.*,
219 F.3d 674 (7th Cir. 2000) ....................................................6, 7

*BlackRock Fin. Mgmt. Inc. v.*
*Segregated Account of Ambac Assurance Corp.*,
673 F.3d 169 (2d Cir. 2012) ....................................................4

*Caplin v. Marine Midland Grace Trust Co.*,
406 U.S. 416 (1972) ....................................................3

*Casey v. Long Island R.R.*,
406 F.3d 142 (2d Cir. 2005) ....................................................7

*CWCapital Asset Mgmt., LLC v. Chicago Props., LLC*,
610 F.3d 497 (7th Cir. 2010) ....................................................13

*Doninger v. Niehoff*,
642 F.3d 334 (2d Cir. 2011) ....................................................7

*Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*,
837 F. Supp. 2d 162 (S.D.N.Y. 2011) ....................................................12-13

*Figueiredo Ferraz E Engenharia de Projeto Ltda. v. Republic of Peru*,
665 F.3d 384 (2d Cir. 2011) ....................................................8

*Gilbert v. Comm'r*,
248 F.2d 399 (2d Cir. 1957) ....................................................11, 14

*Greenwich Fin. Servs. Distressed Mortg. Fund 3 LLC v.*
*Countrywide Fin. Corp.*,
603 F.3d 23 (2d Cir. 2010) ....................................................13

*In re City of New York*,
607 F.3d 923 (2d Cir. 2010) ....................................................8

*Johnson v. Burken*,
930 F.2d 1202 (7th Cir. 1991) ....................................................8

*Kiobel v. Royal Dutch Petroleum Co.*,
621 F.3d 111 (2d Cir. 2010) ....................................................7

iii

# TABLE OF AUTHORITIES
## (continued)

*Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille
Lauro in Amministrazione Straordinaria*,
921 F.2d 21 (2d Cir. 1990) ........................................................... 10

*LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*,
424 F.3d 195 (2d Cir. 2005) .......................................................... 13

*Mohawk Indus., Inc. v. Carpenter*,
558 U.S. 100 (2009) ....................................................................6-7

*Murray v. Metro. Life Ins. Co.*,
583 F.3d 173 (2d Cir. 2009) ............................................................ 7

*NML Capital, Ltd. v. Banco Central de la Republica Argentina*,
652 F.3d 172 (2d Cir. 2011) ............................................................ 7

*Policemen's Annuity & Benefit Fund v. Bank of Am., NA*,
2012 WL 6062544 (S.D.N.Y. 2012) ................................................ 12

*TIFD III-E v. United States*,
459 F.3d 220 (2d Cir. 2006) .......................................................... 14

*Trust for Certificate Holders of Merrill Lynch Mortg. Passthrough
Certificates Series 1999-C1 v. Love Funding Corp.*,
2005 WL 2582177 (S.D.N.Y. 2005) ................................................ 13

*Weber v. United States*,
484 F.3d 154 (2d Cir. 2007) ............................................................. 6

## Statutes

15 U.S.C.
§ 77ddd ........................................................................................ 9
§ 77ddd(a)(1) ...................................................................... 3, 11, 14
§ 77ddd(a)(2). ........................................................................... 3, 4
§ 77ggg ........................................................................................ 3
§ 77jjj ........................................................................................... 3
§ 77ooo ........................................................................................ 3

28 U.S.C. § 1292(b) .............................................................. *passim*

iv

# TABLE OF AUTHORITIES
## (continued)

Trust Indenture Act of 1939
  § 303(12) ...................................................................................17
  § 304(a)(1) ..........................................................................*passim*
  § 304(a)(2) ..........................................................................*passim*
  § 310(a)(5) ...................................................................................17
  § 311(a) .....................................................................................17
  § 314 ..........................................................................................17
  § 316(b) .....................................................................................16
  § 317(a) .....................................................................................17

## Other Authorities

14 U.S. Secs. Law for Financial Trans. (2012 update) ....................................15

16 Charles A. Wright et al.,
  *Federal Practice & Procedure* (2d ed. 2012) ....................................8

John Arnholz & Edward E. Gainor, *Offerings of Asset-Backed
  Securities* (2006) ......................................................................10

Frank J. Fabozzi, *Accessing Capital Markets
  Through Securitization* (2001) .................................................10

Tamar Frankel, *Securitization* (2d ed. 2005) ....................................10

Talcott J. Franklin & Thomas F. Nealon, *Mortgage & Asset Backed
  Securities Litigation Handbook* (2011 update) ...........................10

Michael S. Gambro & Scott Leichtner, *Selected Legal Issues Affecting
  Securitization*, 1 N.C. Banking Inst. 131 (1997) .........................10

Harbor Financial, Inc., SEC No-Action Letter,
  1988 WL 235128 (Oct. 31, 1988) ................................................9

Mortgage-Backed Securities (2012) ..................................................10

PWBA Office of Regulations and Interpretations, letter dated Oct. 23,
  1996, http://tinyurl.com/ajcnxcf ...............................................9

Edward J. O'Connell & Emily Goodman, 981 Prac. Law Inst.,
  *New Developments in Securitization 2004* ...............................10

## TABLE OF AUTHORITIES
### (continued)

SEC Trust Indenture Act Interpretations, at Question & Answer
    202.01 (May 3, 2012), http://tinyurl.com/cmud2j ...................................... 9

# INTRODUCTION

The Bank of New York Mellon (BNYM) petitions this Court to accept for interlocutory appeal an Order that the district court issued in this case on April 3, 2012. A1-A19. The district court certified that Order for appeal pursuant to 28 U.S.C. § 1292(b) on February 14, 2013. A20-A31.[1]

The Order addresses a recurring and unsettled legal question of enormous practical significance: whether mortgage securitization trusts governed by Pooling and Servicing Agreements (PSAs) are subject to the Trust Indenture Act of 1939 (TIA), 15 U.S.C. §§ 77aaa *et seq.* In holding that such trusts *are* subject to the TIA, the district court expressly disregarded the contrary views of the Securities and Exchange Commission. It also rejected the uniform, decades-long practice of *all* participants in a trillion-dollar market, leaving those participants in a state of uncertainty about their future obligations and past liabilities. Consequently, as the district court candidly acknowledged, there are "substantial grounds for difference of opinion" on the question presented. A29. For that reason, the request for certification was supported below by an extraordinary range of *amici*, including all segments of the industry and the chairs of the interested ABA committees.

---

[1] The district's Order and certification are attached as an appendix, which we cite as Axx.

1

This Court should now grant permission to appeal under Section 1292(b). The Order involves a pure and controlling question of law: As the district court found in certifying its Order, reversal "'could significantly affect the conduct of the action.'" A29. And there surely is ground to question the holding below: The Order is contrary to the express guidance of the SEC; the unanimous opinion of academic, legal, and industry commentators; and longstanding industry practice. Thus, as the district court itself recognized, "the applicability of the TIA to the [certificates at issue here] raises 'novel and complex' issues that could impact a large number of cases." *Id*.

The need for review is especially acute because the question here involves a matter of great practical importance. The Order is inconsistent with the settled expectations of the securities markets, as reflected in innumerable complex transaction documents that cannot easily be amended. It imposes duties on parties to those contracts that, in some cases, are impossible to fulfill. And it creates significant uncertainty regarding both numerous PSA-governed trusts that currently exist and the rules governing new securitizations going forward. Indeed, since the Order was issued, securities-offering documents for at least thirty-two PSA-regulated trusts—worth over $30 billion—have expressly declined to comply with the TIA. In these circumstances, immediate and decisive resolution of the question presented by this Court is imperative.

## QUESTION PRESENTED

Whether certificates evidencing beneficial ownership interests in trusts holding multiple mortgage loans are subject to the Trust Indenture Act.

## RELIEF SOUGHT

BNYM seeks immediate review and reversal of the district court's Order of April 3, 2012.

## BACKGROUND

1. This case concerns the reach of the TIA, which creates significant procedural requirements for covered trust instruments. A covered instrument must be qualified by the SEC (15 U.S.C. § 77ggg), trustees must satisfy specified eligibility and qualification standards (*id.* § 77jjj), and trustees are assigned certain duties and responsibilities (*id.* § 77ooo). *See Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416, 425-26 (1972). At the same time, the TIA exempts from its coverage a broad array of financial instruments. Section 304(a)(1) exempts (among other things) equity securities, providing that the statute applies only if the security is a "note, bond, debenture or evidence of indebtedness" or a "certificate of interest or participation" in such debt securities. 15 U.S.C. § 77ddd(a)(1). Separately, Section 304(a)(2) exempts "any certificate of interest or participation in two or more securities having substantially different rights and privileges." *Id.* § 77ddd(a)(2).

2. Plaintiffs allege that they invested in twenty-six different mortgage-securitization trusts for which BNYM serves as trustee. A2. Twenty-five of these trusts are formed under New York law and are governed by a PSA. *Id*. In the PSAs, affiliates of Countrywide Financial Corp. (collectively, Countrywide) transferred residential mortgage loans to BNYM to be held in trust. A1-A3; *see also BlackRock Fin. Mgmt. Inc. v. Segregated Account of Ambac Assurance Corp.*, 673 F.3d 169, 173 (2d Cir. 2012). In exchange, Countrywide became the initial beneficiary of each trust; that interest is documented in trust Certificates. Countrywide then sold those certificates to investors (the certificateholders). The Certificates state that they "represent[] a beneficial ownership interest in the Trust Fund." A8. Each class of Certificates is entitled to a "distribution," up to a specified maximum, from whatever income the trusts collect each month. *Id*. Failure to pay the maximum distribution is not an "Event of Default" under the PSAs, the Certificates may not be "accelerated" (because there is no amount due to accelerate), and neither the holders nor the trustee has a right to sue the trust corpus or foreclose on its assets. *Id*.[2]

Plaintiffs accuse BNYM of misconduct in administering the trusts, asserting claims under the TIA and state law. A3-A4. BNYM moved to dismiss

---

[2] The other securitization has a different structure. It involves a Delaware statutory trust, for which The Wilmington Trust Company serves as trustee. That trust issued notes that are subject to an indenture.

the complaint. Of particular relevance here, BNYM contended that the TIA does not apply to securitizations governed by PSAs and thus sought dismissal of the TIA claims against the twenty-five New York trusts.

3. On April 3, 2012, the district court denied the motion in relevant part.[3] In finding that the TIA applies to PSA-governed trusts, the court determined that trusts organized pursuant to PSAs are "debt securities, not equity." A11. For this reason, the court rejected application of TIA § 304(a)(1). *Id*. Additionally, the court held that PSA-governed trusts are not "certificates of interest or participation" and thus are not exempt under Section 304(a)(2). A12. The court acknowledged that its conclusion was at odds with longstanding SEC guidance. A9. It nonetheless determined that the SEC's position was "unsupported, contrary to the case law, and unpersuasive," and therefore warranted no judicial deference. A12.

BNYM subsequently sought reconsideration or certification. That motion was supported by amicus briefs or letters filed by the Securities Industry and Financial Markets Association, the American Bankers Association, The Clearing House, and the chairs of the American Bar Association's Trust Indentures and Indenture Trustees Committee and Securitization and Structured Finance Committee. On February 14, 2013, the district court de-

---

[3]  The court did grant other portions of BNYM's motion to dismiss. For example, it dismissed plaintiffs' claims with respect to 508 securitizations in which they had never invested. A5-A6.

nied reconsideration but certified its Order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). The court recognized that the question presented "raises 'novel and complex' issues that could impact a large number of cases," as to which there is "substantial grounds for difference of opinion" and that "remains[] unsettled, contributing to industry uncertainty." A29. And because the case "may be considerably streamlined if the claims involving the twenty-five New York trusts are dismissed," the court concluded, "the prompt resolution of this issue on appeal may materially advance the termination of this litigation." *Id*.

## REASONS FOR PERMITTING THE APPEAL

This is precisely the kind of case that Section 1292(b) was meant to address: It involves a "pure question of law" that this Court can "decide quickly and cleanly," and immediate appellate review could "head off protracted, costly litigation" because the question is "indeed a *controlling* issue." *Ahrenholz v. Bd. of Trustees of Univ. of Ill.*, 219 F.3d 674, 677 (7th Cir. 2000). The courts of appeals have recognized a "duty … to allow an immediate appeal to be taken when the statutory criteria are met," as they are here. *Id*. Immediate appellate review is especially appropriate in this case because it would "assure the prompt resolution of [a] knotty legal problem[]" (*Weber v. United States*, 484 F.3d 154, 159 (2d Cir. 2007)) that involves a matter of "special consequence" (*Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 111 (2009)) to

6

the securitizations market. Absent immediate review by this Court, the law will remain in an intolerable state of confusion.

## A.    The criteria for an interlocutory appeal are satisfied.

"To warrant [a] grant [of] leave to appeal pursuant to [Section 1929(b)], (a) the appeal must concern a question 'of law,' (b) that question must be one that is 'controlling,' and (c) that controlling question of law must be one 'as to which there is substantial ground for difference of opinion.'" *Casey v. Long Island R.R.*, 406 F.3d 142, 146 (2d Cir. 2005) (quoting 28 U.S.C. § 1292(b)). This Court regularly grants petitions for interlocutory review when these criteria are satisfied.[4] Because, as the district court concluded, the criteria are satisfied in this case, the Court should grant this petition.

### 1.    *The issue presented is a controlling question of law.*

To begin with, whether the TIA applies to trusts formed under PSAs presents a question of "pure" law suitable for "quick[] and clean[]" appellate review without the need for "immersion" in a "detailed" trial record. *Ahrenholz*, 219 F.3d at 677. The facts here, insofar as they bear on the question presented, are not in dispute; the answer to that question turns on the legal significance of those facts.

---

[4]    *See*, *e.g.*, *NML Capital, Ltd. v. Banco Central de la Republica Argentina*, 652 F.3d 172 (2d Cir. 2011); *Doninger v. Niehoff*, 642 F.3d 334 (2d Cir. 2011); *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111 (2d Cir. 2010); *Murray v. Metro. Life Ins. Co.*, 583 F.3d 173 (2d Cir. 2009).

Moreover, that question is "controlling" within the meaning of Section 1292(b). A question generally is "controlling" if "interlocutory reversal might save time for the district court, and time and expense for the litigants" (16 Charles A. Wright *et al.*, *Federal Practice & Procedure* § 3930 (2d ed. 2012)) or when reversal would "speed the District Court's consideration of the merits of the parties' claims or defenses." *In re City of New York*, 607 F.3d 923, 933 (2d Cir. 2010). There can be no doubt that the question here meets these standards: Reversal of the district court's TIA holding would eliminate most of the claims in this suit. As the district court concluded, this litigation "may be considerably streamlined if the claims involving the twenty-five New York trusts are dismissed." A29.[5]

### 2. *The order is contestable.*

*a.* In addition, whether the TIA applies to the New York certificates is, at the least, contestable. In the Order, the district court concluded that, "[b]ecause the New York certificates are debt securities, the TIA applies."

---

[5] To be sure, plaintiffs also press a claim against one Delaware Trust that is governed by an indenture, not a PSA. But a question is controlling "even though its decision might not lead to reversal on appeal" if its resolution nevertheless will substantially expedite the litigation. *Johnson v. Burken,* 930 F.2d 1202, 1206 (7th Cir. 1991) (quotation marks omitted). That is the case here: The district court found that "prompt resolution of this issue on appeal may materially advance the termination of this litigation" (A29), and that determination—which relates to the court's case-management prerogatives—is "entitled to considerable deference." *Figueiredo Ferraz E Engenharia de Projeto Ltda. v. Republic of Peru*, 665 F.3d 384, 400 (2d Cir. 2011).

8

A12 (citing 15 U.S.C. § 77ddd). But for more than twenty years, the SEC has said exactly the opposite, and that position has guided the development of the securitization market.[6] *See* SEC Trust Indenture Act Interpretations, at Question & Answer 202.01 (May 3, 2012), http://tinyurl.com/cmud2j ("[c]ertificates representing a beneficial ownership interest in a trust" where the "assets of the trust include a pool of mortgage loans with multiple obligors administered pursuant to a 'pooling and servicing agreement' are "treated as exempt from the Trust Indenture Act under Section 304(a)(2) thereof"); Harbor Financial, Inc., SEC No-Action Letter, 1988 WL 235128 (Oct. 31, 1988) (in no-action letter, SEC agreed that certificates for an interest in a pool of mortgages are exempt from the TIA). The Department of Labor has issued the same guidance, classifying this type of certificate, issued in a mortgage-loan securitization, as equity for purposes of ERISA. *See* PWBA Office of Regulations and Interpretations, letter dated Oct. 23, 1996, http://tinyurl.com/ajcnxcf ("[I]t is the view of the Department that the pass-through certificates representing a beneficial interest in the trust . . . constitute equity interests."). Commentators, too, have agreed—without excep-

---

[6]  Despite the Order, the SEC Staff has retained its longstanding position; the SEC website states only that it "is considering" this guidance in light of the Order.

tion—that pass-through certificates are exempt from the TIA.[7] And plaintiffs' counsel have themselves announced that the district court's decision was unprecedented (*see* Dkt. No. 49, Pls.' Mem. of Law in Opp'n to BNYM's Mot. to Reconsider, at 15), which itself shows that there is substantial ground for difference of opinion. *See*, *e.g.*, *Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria*, 921 F.2d 21, 25 (2d Cir. 1990) (certification warranted where issue is "difficult and of first impression").

The district court itself agreed that "BNYM and its *amici* advance arguments for reconsideration that … underscore the existence of substantial

---

[7] *See*, *e.g.*, Tamar Frankel, *Securitization* § 12.26 (2d ed. 2005) ("The TIA applies only to some types of asset-backed securities. If an SPV issues equity securities, the TIA does not apply to them because section 304(a)(1) excludes [equity]"); Mortgage-Backed Securities § 6:67 (2012) ("Pass-through certificates, because they represent ownership of the underlying mortgages, are regarded as equity rather than debt and are not issued under a qualified indenture."); John Arnholz & Edward E. Gainor, *Offerings of Asset-Backed Securities* § 14.05[A] & nn.78-79 (2006) ("Section 304(a)(1) excludes equity securities from the TIA. Nearly every offering of securities structured as pass-through certificates is therefore exempt."); Edward J. O'Connell & Emily Goodman, 981 Prac. Law Inst., *New Developments in Securitization 2004*, at 989 (certificates "represent the ownership in the Trust and are viewed as equity by the [SEC]. Consequently, the Pooling Agreement is not required to comply with the Trust Indenture Act of 1939."); Frank J. Fabozzi, *Accessing Capital Markets Through Securitization* 238 (2001); Michael S. Gambro & Scott Leichtner, *Selected Legal Issues Affecting Securitization*, 1 N.C. Banking Inst. 131, 149 (1997). Indeed, even a leading attorney for plaintiffs in such actions agrees that the TIA does not apply to trust certificates. *See* Talcott J. Franklin & Thomas F. Nealon, *Mortgage & Asset Backed Securities Litigation Handbook* §§ 1:44, 4:36 (2012 update).

grounds for difference of opinion." A29. Thus, "the applicability of the TIA to mortgage-backed securities remains unsettled, contributing to industry uncertainty." *Id.*

**b.** In fact, there are compelling reasons to believe that the district court was wrong in holding that the TIA applies to PSA-governed trusts. Section 304(a)(1) exempts any security that is not debt or a "certificate of interest or participation" in debt. 15 U.S.C. § 77ddd(a)(1). The district court concluded that the certificates are debt, and that the (a)(1) exception accordingly does not apply. A11. That conclusion was wrong.

PSA-governed trusts lack the defining characteristic of debt: an obligation to pay a sum certain on demand or at a fixed maturity date. *See Gilbert v. Comm'r*, 248 F.2d 399, 402 (2d Cir. 1957) ("The classic debt is an unqualified obligation to pay a sum certain at a reasonably close fixed maturity date along with a fixed percentage in interest payable regardless of the debtor's income or lack thereof."). A certificateholder is not owed a certain amount of money at any time.[8] Instead, the master servicer pools income from the trust

---

[8]  The district court incorrectly stated that the "certificates have a fixed maturity date." A11. The "Maturity Date" on the face of the Certificates is the "Latest Possible Maturity Date," a term that is defined as three years after the scheduled maturity of the last *mortgage loan*. It is unrelated to when payments are made under the Certificates. The trusts continue until the earlier of the Latest Possible Maturity Date and the date "21 years from the death of the last survivor of the descendants of Joseph P. Kennedy, the late Ambassador of the United States to the Court of St. James's, living on the

assets (*i.e.*, the individual mortgages) and pays the resulting proceeds to cer-tificateholders. As the district court noted (A11), the PSAs fix *dates* for these distributions. PSA §§ 3.05(a), 3.05(b).[9] But the agreements do not fix the *amount* that the trusts must pay; they require only that the trustee distri-bute whatever proceeds the master servicer collects. *Id*. §§ 3.08(a), 4.02 (re-quiring that the master servicer attempt to collect amounts due on mortgage loans and then transfer whatever it collects to the trustee for distribution to certificateholders).[10]

In reaching the opposite conclusion, the district court made two errors. *First*, the court looked to dicta in other decisions that refer to PSA-governed certificates as "resembling debt." A9-A10. But none of these decisions actual-ly held that trust certificates *are* debt, let alone subject to the TIA. For ex-ample, the district court relied on *Ellington Credit Fund, Ltd. v. Select Port-folio Servicing, Inc.*, 837 F. Supp. 2d 162, 181-82 (S.D.N.Y. 2011), but the

---

date hereof." PSA § 9.01. Neither of these dates is "fixed" and, in any event, no payment is due on either date.

[9]    Plaintiffs attached to their Complaint, as Exhibit C, an example of a PSA.

[10]    In denying reconsideration, the district court pointed to *Policemen's An-nuity & Benefit Fund v. Bank of America, NA*, 2012 WL 6062544, at *16 (S.D.N.Y. 2012), where another district court stated that "the obligation to pay the certificate-holders *always* exists; that obligation, however, cannot be *met* if individual mortgagors default on their principal and interest pay-ments." *See* A25. That conclusion is flatly wrong. The obligation in the PSA is *defined* as the allocable share of proceeds collected. If collections are zero, the obligation (not just the ability to distribute) is zero. Absent collections on the underlying mortgages, certificateholders are not owed any sum.

court in that case carefully noted that the defendants had "offer[ed] no argument" that the certificates are not debt, repeating that observation three times. The other decisions cited by the district court simply contain casual references to mortgage-backed securities as "bonds." These statements have no bearing here, both because none of these courts actually considered the debt/equity distinction and because some securities that are backed by mortgage loans *are* in the form of debt. *See Greenwich Fin. Servs. Distressed Mortg. Fund 3 LLC v. Countrywide Fin. Corp.*, 603 F.3d 23, 29 (2d Cir. 2010); *CWCapital Asset Mgmt., LLC v. Chicago Props., LLC*, 610 F.3d 497, 499 (7th Cir. 2010); *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 200 (2d Cir. 2005) (referring to "'bonds' or 'certificates'"); *Trust for Certificate Holders of Merrill Lynch Mortg. Passthrough Certificates Series 1999-C1 v. Love Funding Corp.*, 2005 WL 2582177, at *1 (S.D.N.Y. 2005).

*Second*, while setting aside the SEC's interpretation of the TIA, the district court relied in substantial part on IRS rules for distinguishing debt and equity under the Internal Revenue Code. A10-A11. The court provided no basis for importing rules developed in the tax context into the TIA. But to the extent that the tax standards provide useful guidance, they point deci-

sively in favor of characterizing PSA-governed certificates as equity, not debt.[11]

For example, the tax inquiry turns on the fundamental hallmark of debt—a promise to pay a sum certain. *Gilbert*, 248 F.2d at 402. No such promise exists here. Relatedly, non-payment is not a breach of the PSAs or the certificates, and holders have no right to enforce payment, in stark contrast to the rights of holders of true debt instruments. Moreover, the certificates themselves state that they convey equity; they "represent[] a beneficial ownership interest in the Trust Fund." A8. Finally, for regulatory purposes, PSA certificates have *always* been treated as equity by the SEC and DOL and thus are exempt from the TIA.

Other than debt, the only securities that are *not* exempt under Section 304(a)(1) are "certificates of interest or participation" in debt. *See* 15 U.S.C. § 77ddd(a)(1)(B). The district court, however, held that the securities here are not certificates of interest or participation. *See* A12.

_____

[11] The district court looked to the IRS factors discussed in *TIFD III-E v. United States*, 459 F.3d 220, 235 n.15 (2d Cir. 2006), which cited I.R.S. Notice 94-47. These factors include "whether there is an unconditional promise on the part of the issuer to pay a sum certain on demand or at a fixed maturity date that is in the reasonably foreseeable future," "whether holders of the instruments possess the right to enforce the payment of principal and interest," and "whether the instruments are intended to be treated as debt or equity for non-tax purposes, including regulatory … purposes." *Id.*

But even if the New York certificates *are* "certificates of interest or participation," the TIA still would not apply because the securities would be exempt under Section 304(a)(2). Subsection (a)(2) exempts "any certificate of interest or participation in two or more securities having substantially different rights and privileges." Each trust consists of hundreds of mortgage loans, and there can be no question that the loans convey substantially different rights and privileges. A debt is a promise by a borrower to pay a fixed sum, plus interest at a specific rate, on a date certain, sometimes secured by collateral. The mortgage loans underlying the trusts here were taken out by different borrowers, for different principal amounts, with different interest rates and maturity dates, secured by different pieces of real estate, and governed by the laws of different states. Hence, if the certificates were not exempt under subsection (a)(1) on the theory that they are "certificates of interest or participation in … note[s]," they would be exempt under (a)(2).[12] *See*, *e.g.*, 14 U.S. Secs. Law for Financial Trans. § 4:36 (2012 update) ("The certificates are exempt from the Trust Indenture Act under § 304(a)(2) of that Act.").

---

[12]  In its initial Order, the court squarely addressed (a)(2). A12. Because that issue was passed on in the Order, it is preserved for this Court's review, to the extent that the PSA securities are construed as "certificates of interest or participation" at all.

### B.    Whether the TIA applies to trusts governed by a PSA is a matter of tremendous practical importance.

While satisfaction of the statutory criteria is, in itself, sufficient to warrant granting the petition, practical considerations make the need for interlocutory appellate review in this case compelling. This Court's immediate intervention is necessary to dispel the uncertainty created by the district court's order and to settle the obligations and rights of those participating in the securitization markets.

**1.** The issue presented here is of enormous practical concern to an immense industry. Prior to the district court's decision, the SEC had concluded that trusts like those at issue in this case are not subject to the TIA. In reliance on that guidance, *no* PSA-governed trust, so far as we are aware, *ever* has registered under the TIA or satisfied the statute's other requirements. Those trusts have issued securities worth many hundreds of billions, and more likely trillions, of dollars. If those trusts are now believed subject to the TIA by virtue of the analysis in the district court's Order, the consequences would be profoundly disruptive. As just a few examples:

*First*, Section 4.02 of the PSAs requires the write-off of certificate balances whenever a loss occurs on an individual mortgage loan (further evidence that the "principal" balances of the securities are not "sums certain"). Yet Section 316(b) of the TIA prohibits reducing the principal amount of any covered security. Removing the write-off provisions from the PSAs would

16

radically and unpredictably change the agreed-upon economics of the securitizations and require trustees to improvise new contract terms.

*Second*, the Certificates do not provide for a "payment default," as is assumed by Sections 311(a) and 317(a) of the TIA.

*Third*, TIA Section 314 imposes detailed reporting requirements on the "obligor." But the PSAs expressly state that none of the parties to the trust are "obligors"—not the trustee, the master servicer, the seller, or the depositor.

*Fourth*, TIA Section 303(12) states that the definition of "obligors" includes not only obligors on the covered securities but also, "if such security [subject to the TIA] is a certificate of interest or participation, … every person … who is liable upon the security or securities in which such certificate evidences an interest or participation." The assets in which the Certificates "evidence[] a beneficial ownership interest" are the mortgage loans of millions of homeowners, who could now be held liable under Section 314 of the TIA.

*Fifth*, if the trust fund is held to be the obligor, Section 310(a)(5) prohibits anyone from serving as trustee who "directly or indirectly control[s]" the obligor. Yet the PSAs require that a trustee *own* the trust assets.

17

Unless the Order is reversed, courts will be faced with the impossible task of subjecting PSA-governed trusts to the discordant obligations imposed by the TIA.

2.    The confusion and paralyzing uncertainty caused by the district court's order are not theoretical. Market participants currently do not know what rules control many significant securitization offerings. In fact, some of the largest market participants have expressly rejected the district court's analysis and are still offering PSA-governed trusts that are not qualified under the TIA. To offer just one of many examples, a prospectus filed by JP Morgan Chase Commercial Mortgage Securities Corp. noted the decision but indicated that it believes the "ruling is contrary to SEC guidance and historical industry practice" and thus concluded that "the Pooling and Servicing Agreement is not required to be qualified under the TIA." *See* Free Writing Prospectus, J.P. Morgan Chase Commercial Mortgage Securities Trust 2012-C6, SEC Reg. Statement No. 333-165147-02, at S-222 to S-223 (April 9, 2012).

In fact, since the decision below, we are aware of thirty-two new trusts—worth over $30 billion—that have expressly rejected the district court's conclusion.[13] *See* A32-A33 (complete list). Other issuers will have to

---

[13] This includes new securitizations issued by UBS, Goldman Sachs, and Deutsche Bank. *See* Free Writing Prospectus, UBS Commercial Mortgage Trust 2012-C1, SEC Reg. Statement No. 333-177354-01, at 259 (April 17,

decide whether to be guided by the SEC or by the district court's conflicting analysis, both in their future actions and in determining whether steps must be taken to conform prior issues to the TIA's requirements. Immediate, authoritative resolution of the uncertainty by this Court is essential to the efficient operation of the market.

## CONCLUSION

The petition for interlocutory review should be granted.

---

2012) ("The Depositor believes that such ruling is contrary to SEC guidance and historical industry practice."); Free Writing Prospectus, GS Mortgage Securities Trust 2012-GCJ7, SEC Reg. Statement No. 333-171508-03, at 266 (May 14, 2012); Free Writing Prospectus, COMM 2012-CCRE1, SEC Reg. Statement No. 333-172143-04, at S-235 (May 15, 2012).

Respectfully submitted,


/s/ Charles A. Rothfeld

Charles A. Rothfeld
Paul W. Hughes
   *Mayer Brown LLP*
   *1999 K Street NW*
   *Washington, DC 20006*
   *(202) 263-3000*

Matthew D. Ingber
Christopher J. Houpt
   *Mayer Brown LLP*
   *1675 Broadway*
   *New York, NY 10019*
   *(212) 506-2500*


*Counsel for Defendant-Petitioner*

Dated: February 25, 2013

**APPENDICES**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
                                          :
RETIREMENT BOARD OF THE                   :        11 Civ. 5459 (WHP)
POLICEMEN'S ANNUITY AND                   :
BENEFIT FUND OF THE CITY                   :        MEMORANDUM & ORDER
OF CHICAGO, et al.,                       :
                                          :
                 Plaintiffs,              :
                                          :
        -against-                         :
                                          :
THE BANK OF NEW YORK MELLON,   :
                                          :
                 Defendant.               :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #:                           │
│ DATE FILED:  4/3/12              │
└─────────────────────────────────┘
```

WILLIAM H. PAULEY III, District Judge:

      Plaintiffs—suing individually, on behalf of a putative class, and derivatively—

own mortgage-backed securities issued by trusts for which Defendant, The Bank of New York

Mellon ("BNYM"), serves as trustee. They allege that BNYM violated several provisions of the

Trust Indenture Act of 1939, 15 U.S.C. § 77aaa, et seq. (the "TIA"), and breached its contractual

and fiduciary duties. BNYM moves to dismiss the Class Action and Derivative Complaint in its

entirety. For the following reasons, BNYM's motion to dismiss is granted in part and denied in

part.

### BACKGROUND

      This case is another installment in litigation over BNYM's obligations as trustee

for hundreds of securitization trusts. The structure of the underlying residential mortgage

securitization transactions is familiar: "To raise funds for new mortgages, a mortgage lender

-1-

**A1**

sells pools of mortgages into trusts created to receive the stream of interest and principal

payments from the mortgage borrowers. The right to receive trust income is parceled into

certificates and sold to investors, called certificateholders." BlackRock Fin. Mgmt. Inc. v.

Segregated Account of Ambac Assurance Corp., ---F.3d----, 2012 WL 611401, at *1 (2d Cir.

2012). Here, the mortgage lenders are Countrywide Home Loans, Inc. and various affiliates

("Countrywide"). (Class Action and Derivative Complaint, dated Aug. 31, 2011 ("Compl." or

the "Complaint") ¶ 35.) Bank of America Corporation ("Bank of America") now owns

Countrywide. (Compl. ¶ 15.)

Plaintiffs hold securities issued by twenty-five New York trusts and one Delaware

trust. (Compl. Ex. B.) BNYM is trustee for the New York trusts, and Countrywide (now Bank

of America) is the "master servicer." (Compl. ¶¶ 1, 15, 96 n.2.) As in BlackRock, 2012 WL

611401, at *1, the terms of the New York trusts as well as the rights, duties, and obligations of

the trustee and the master servicer are set forth in Pooling and Servicing Agreements ("PSAs").

(Compl. ¶ 2; Compl. Ex. C: Pooling and Servicing Agreement dated Sept. 1, 2006 ("PSA").)[1]

The PSAs also govern the trustee's distribution of money to certificateholders. (Compl. ¶¶ 1, 2.)

The Delaware trust operates similarly, with a few key differences. The Delaware trust issued

notes, subject to an indenture, for which BNYM serves as indenture trustee. (Declaration of

Matthew D. Ingber, dated Dec. 16, 2011 ("Ingber Decl.") Ex A: Indenture, dated Mar. 30, 2006

("Indenture") § 3.04, Annex 1 (Glossary).) Concurrently, the Delaware trust entered into a Sale

and Servicing Agreement ("SSA") governing the sale of the underlying mortgage loans and the

---

[1] The parties do not dispute that the PSA attached as Exhibit C to the Complaint is representative of the PSAs governing all of the New York trusts at issue. See BlackRock, 2012 WL 611401, at *1 n.2 ("[T]he agreements are sufficiently similar for the Court to rely on a representative PSA[.]").

master servicer's responsibilities.  (Ingber Decl. Ex. B:  Sale and Servicing Agreement, dated Mar. 30, 2006 ("SSA").) [2]

The PSAs, Indenture, and SSA governing the trusts contain representations and warranties concerning the quality of the underlying mortgages, the duties of BNYM as trustee, and the structure of the securities issued by the trusts.  (Compl. ¶¶ 33-48; Ingber Decl. Exs. A, B.)  Plaintiffs allege that BNYM's duties include perfecting the assignment of the mortgages to the trusts, reviewing each of the loan files for the mortgages, certifying that the documentation for each of the mortgages is accurate and complete, creating a Document Exception Report listing any incomplete loan files, and ensuring that the master servicer cures, substitutes, or repurchases all mortgages listed on that Report.  (Compl. ¶¶ 35-47.)

Plaintiffs claim that Countrywide breached its obligations as master servicer by failing "to provide mortgage loan files in their possession, to cure defects in the mortgage loan files and/or to substitute the defective loans with conforming loans." (Compl. ¶ 87.)  They further allege that BNYM did nothing to remedy the inadequate servicing of the mortgages undergirding the trusts.  Specifically, they contend that BNYM failed to take possession of the loan files, review the loan files adequately, and require Countrywide and Bank of America to cure, substitute, or repurchase the defective loans.  To support these allegations, Plaintiffs cite the bankruptcy court testimony of a Countrywide employee, who stated that it was Countrywide's standard business practice to retain the original mortgage notes and other documentation, rather than delivering them to BNYM as trustee.  (Compl. ¶¶ 55-58.)  Plaintiffs also cite a 2011 Joint Report by the Federal Reserve and other agencies flagging "concerns about the prevalence of

_____

[2] The parties do not dispute that the Indenture and SSA attached to the Declaration of Matthew D. Ingber govern the Delaware trust in which Plaintiffs allege holdings.

-3-

A3

irregularities in the documentation of ownership [that] may cause uncertainties for investors of securitized mortgages." (Compl. ¶ 60.) Similarly, the New York Attorney General alleged that BNYM failed to ensure the complete transfer of mortgages and loan files from Countrywide to the trusts. (Compl. ¶ 61.)

        The gravamen of the Complaint is that a prudent trustee would have remedied these failures by requiring the master servicer to cure or repurchase the defective loans in the trusts, and would have compelled the master servicer to comply with its servicing duties. Yet BNYM allegedly took no action to protect investors.[3] Rather, on June 28, 2011, BNYM entered into an agreement with Countrywide and Bank of America to settle all potential claims belonging to the trusts for which it is trustee for $8.5 billion. See BlackRock, 2012 WL 611401, at *2. Plaintiffs contend that—regardless of the settlement's fairness—BNYM caused them significant losses. They allege that the value of their mortgage-backed securities plummeted as a consequence of the underwriting defects and inadequate servicing of the underlying mortgages. (Compl. ¶¶ 74-76.)

## DISCUSSION

### I.    Legal Standard

        To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S.

---

[3] In Walnut Place LLC v. Countrywide Home Loans, Inc., Justice Barbara R. Kapnick concluded that BNYM "did, in fact, act upon plaintiffs' complaints, as demonstrated by the settlement agreement reached with the defendants[.]" Index No. 650497/11, at *15 (N.Y. Sup. Ct. Mar. 28, 2012). At this preliminary stage, this Court expresses no opinion regarding BNYM's diligence.

544, 570 (2007)).  To determine plausibility, courts follow a "two pronged approach."  Iqbal, 129

S. Ct. at 1950.  "First, although a court must accept as true all of the allegations contained in a

complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements

of a cause of action, supported by mere conclusory statements, do not suffice."  Harris v. Mills,

572 F.3d 66, 72 (2d Cir. 2009) (internal punctuation omitted).  Second, a court determines

"whether the 'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an

entitlement to relief.'"  Hayden v. Paterson, 594 F.3d 150, 161 (2d Cir. 2010) (quoting Iqbal, 129

S. Ct. at 1950).  On a motion to dismiss, courts may consider "facts stated on the face of the

complaint, in the documents appended to the complaint or incorporated in the complaint by

reference, and . . . matters of which judicial notice may be taken."  Allen v. WestPoint–Pepperell,

Inc., 945 F.2d 40, 44 (2d Cir. 1991).

II.  Standing

A.  Trusts in which No Named Plaintiff Invested

Plaintiffs allege current or former ownership of certificates relating to only

twenty-six of the trusts referenced in the Complaint.  (Compl. ¶ 1; Compl. Ex. B (listing

holdings).)  BNYM argues that Plaintiffs lack standing to bring claims based on the trusts in

which no named plaintiff invested.  Although this Court afforded Plaintiffs an opportunity to

amend the Complaint to add additional certificateholders, they declined to do so.  (Hr'g Tr. dated

Feb. 10, 2012 at 39-40.)

Standing under Article III of the Constitution is "the threshold question in every

federal case, determining the power of the court to entertain suit."  Denney v. Deutsche Bank

AG, 443 F.3d 253, 263 (2d Cir. 2006) (quoting Warth v. Seldin, 422 U.S. 490, 498 (1975))

(internal quotation marks omitted). To establish standing, "a plaintiff must have suffered an 'injury in fact' that is 'distinct and palpable'; the injury must be fairly traceable to the challenged action; and the injury must be likely redressable by a favorable decision." Denney, 443 F.3d at 263 (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)).

In accord with these principles, Plaintiffs may not pursue claims relating to securities in which they never invested. In re Smith Barney Transfer Agent Litig., 765 F. Supp. 2d 391, 400 (S.D.N.Y. 2011); see also In re Salomon Smith Barney Mut. Fund Fees Litig., 441 F. Supp. 2d 579, 607 (S.D.N.Y.2006) ("With regard to the sixty-eight funds of which Plaintiffs own no shares, Plaintiffs do not have standing to assert any claims because Plaintiffs cannot satisfy the standing requirements."). Accordingly, Plaintiffs lack standing to assert claims regarding the trusts referenced in the Complaint in which they never invested, and those claims are dismissed with prejudice. Plaintiffs may pursue claims relating only to the twenty-six trusts in which they allege current or former holdings.

B. "Fully Wrapped" Delaware Trust

Plaintiffs hold notes issued by a single Delaware trust. (Compl. Ex. B.) BNYM challenges Plaintiffs' standing to sue regarding this trust because the trust is fully guaranteed—or "wrapped" —by a monoline insurer, and Plaintiffs do not allege that the insurer failed to perform. (Indenture § 8.03.)

Monoline insurers provide "a guarantee to protect against credit risk, i.e. the risk of default." In re Ambac Fin. Grp., Inc. Sec. Litig., 693 F. Supp. 2d 241, 248 (S.D.N.Y. 2010). For "fully wrapped" trusts, then, "the risk of a litigation outcome that impairs the loans in a securitization rests solely with the insurer, not with the security holders." David Reiss, Subprime

-6-

A6

Standardization, 33 Fla. St. U. L. Rev. 985, 1030 n.288 (2006). BNYM contends that this economic reality undermines Plaintiffs' standing because where a "plaintiff suffered no injury, it does not have standing to pursue its TIA claim." Bluebird Partners, L.P. v. First Fid. Bank, 896 F. Supp. 152, 157 (S.D.N.Y. 1995). As the monoline guarantee is evident on the face of the Indenture, and the Indenture is integral to the Complaint, BNYM argues that this Court may consider the guarantee on a motion to dismiss. See United Magazine Co. v. Murdoch Magazines Distrib., Inc., 146 F. Supp. 2d 385, 408 (S.D.N.Y. 2001) ("Although this is a motion under Rule 12(b)(6), the Court may consider the Purchase Agreement because several of plaintiffs['] claims, including this one, are founded upon that contract.").

Ultimately, the presence of the monoline guarantee may preclude Plaintiffs from proving any damages resulting from their ownership of notes issued by the Delaware trust. Nevertheless, Plaintiffs contend that BNYM's alleged conduct caused the value of their notes to drop, and they claim to have sold notes issued by the Delaware trust at a significant loss. (Compl. ¶ 64; Compl. Ex. B.) As such, Plaintiffs have alleged damages beyond those covered by the guarantee. And whether the monoline insurer performed its obligations is a question of fact better resolved on a more fully developed record. See Fair Hous. In Huntington Comm. Inc. v. Town of Huntington, N.Y., 316 F.3d 357, 361 (2d Cir. 2003) ("To the degree that defendants challenge the factual underpinnings of the allegations made by plaintiffs in support of their standing to bring suit, the argument is premature."). Thus, Plaintiffs' damages allegations are sufficient to confer standing, and BNYM's motion to dismiss is denied in this respect.

III.   Trust Indenture Act Claims

   A.   Applicability of the Trust Indenture Act

The parties agree that the TIA applies to the mortgage-backed notes issued by the Delaware trust, but they dispute whether the TIA applies to the certificates issued by the twenty-five New York trusts.  The TIA covers only debt securities, and does not apply to equity securities.  See 15 U.S.C. § 77ddd ("The provisions of this title shall not apply to . . . any security other than . . . a note, bond, debenture, or evidence or indebtedness[.]").  BNYM argues that certificates issued by the New York trusts are equity securities, not debt.

While it cites no case law for the proposition that some mortgage-backed securities are exempt from the TIA, BNYM marshals several treatises in support of its position.  BNYM also argues that the structure of the New York certificates closely resembles equity.  For example, the Delaware Indenture provides that "[a]ll Notes . . . shall be valid obligations of the Issuer, evidencing the same debt[.]"  (Indenture § 2.03(d).)  In contrast, the PSAs governing the New York trusts clarify that certificates "represent[] a beneficial ownership interest in the Trust Fund created by the Agreement."  (PSA, Ex. E.)  Similarly, whereas the Delaware Indenture defines the issuer's failure to pay interest or principal to noteholders as an "event of default," the New York PSAs do not.  (Compare Indenture §§ 5.01(i)-(ii), with PSA §§ 7.01(i)-(ii).)  BNYM asserts that these differences are dispositive because, by definition, a certificate that evidences ownership must be equity, not debt.  See Black's Law Dictionary 541 (6th ed. 1990) (defining "equity security" as "[a] security that represents an equity ownership interest in a corporation, rather than debt").  BNYM also contends that the PSAs' lack of language regarding payment default or acceleration proves that the New York certificates are equity.  Cf. Gilbert v. Comm'r,

-8-

248 F.2d 399, 402 (2d Cir. 1957) ("The classic debt is an unqualified obligation to pay a sum certain at a reasonably close maturity date along with a fixed percentage in interest payable regardless of the debtor's income or lack thereof.").

Finally, BNYM relies on interpretative guidance published on the Securities and Exchange Commission's website. According to the SEC website, "[c]ertificates representing a beneficial ownership interest in a trust . . . . are treated as exempt from the Trust Indenture Act under Section 304(a)(2) thereof." Trust Indenture Act of 1939, Questions and Answers of General Applicability, http://www.sec.gov/divisions/corpfin/guidance/tiainterp.htm (last visited Apr. 3, 2012). BNYM contends that this Court should give "some deference" to the SEC's determination. United States v. Mead Corp., 533 U.S. 218, 234 (2001) ("[A]n agency's interpretation may merit some deference whatever its form[.]").

Yet, despite BNYM's arguments, many courts suggest that certificates similar to those issued by the New York trusts are debt, not equity. To begin with, "as many courts have observed, pass-through certificates are structurally similar in form and function to bonds issued under an indenture." Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc., ---F. Supp. 2d----, 2011 WL 6034310, at *7 (S.D.N.Y. 2011). The Second Circuit has explained that "[i]t is these stakes—the 'bonds' or 'certificates'—that are ordinarily referred to as commercial mortgage-backed securities." LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 200 (2d Cir. 2005); see also CWCapital Asset Mgmt., LLC v. Chi. Props., LLC, 610 F.3d 497, 499 (7th Cir. 2010) (Posner, J.) (describing mortgage-backed securities governed by PSAs as "giant bond[s]"). Indeed, the Second Circuit has characterized PSAs governing securitization trusts as "similar to bond indentures in many respects." Greenwich Fin. Servs.

-9-

**A9**

Distressed Mortg. Fund 3 LLC v. Countrywide Fin. Corp., 603 F.3d 23, 29 (2d Cir. 2010).

Unsurprisingly, several courts in this district have equated mortgage-backed securities governed

by PSAs with debt securities. See Ellington, 2011 WL 6034310, at *7 (holding that a New York

statute applying to "bonds" covers pass-through certificates governed by a PSA); see also Trust

for Certificate Holders of Merrill Lynch Mortg. Passthrough Certificates Series 1999-C1 v. Love

Funding Corp., No. 04 Civ. 9890 (SAS), 2005 WL 2582177, at *1 (S.D.N.Y. Oct. 11, 2005)

("These certificates are essentially bonds secured by a pool of commercial mortgages that the

Trust has purchased from lenders.").

      These decisions reflect the fact that "[t]he shareholder is an adventurer in the

corporate business; he takes the risk, and profits from success. The creditor, in compensation for

not sharing the profits, is to be paid independently of the risk of success, and gets a right to dip

into the capital when the payment date arrives." Comm'r v. O.P.P. Holding Corp., 76 F.2d 11,

12 (2d Cir. 1935). It is well established that, in evaluating whether a security is debt or equity

for tax purposes, "the test cannot be merely the name given to the security." Jewel Tea Co. v.

United States, 90 F.2d 451, 452-32 (2d Cir. 1937) (L. Hand, J.). Rather, under the tax laws,

courts delineate "the vital difference between the shareholder and the creditor," O.P.P., 76 F.2d

at 12, by evaluating, inter alia, the factors set forth in IRS Notice 94-47, 1994-19 I.R.B. 9 (Apr.

18, 1994):

> (a) whether there is an unconditional promise on the part of the issuer to
> pay a sum certain on demand or at a fixed maturity date that is in the
> reasonably foreseeable future; (b) whether holders of the instruments
> possess the right to enforce the payment of principal and interest; (c)
> whether the rights of the holders of the instruments are subordinate to
> rights of general creditors; (d) whether the instruments give the holders the
> right to participate in the management of the issuer; (e) whether the issuer
> is thinly capitalized; (f) whether there is identity between holders of the

instruments and stockholders of the issuer; (g) the label placed upon the instruments by the parties; and (h) whether the instruments are intended to be treated as debt or equity for non-tax purposes, including regulatory, rating agency, or financial accounting purposes.

TIFD III-E, Inc. v. United States, 459 F.3d 220, 235 n.13 (2d Cir. 2006).

Consistent with the case law and the IRS factors, the New York certificates resemble debt. Unlike equity securities, the certificates entitle their holders to regular payments of principal and interest on fixed "Distribution Date[s]." (PSA Preliminary Statement, PSA §§ 1.01, 3.08.) While BNYM observes that corporations typically pay dividends to stockholders on a regular basis as well, the payment of dividends is typically "left to the discretion of the board." eBay Domestic Holdings, Inc. v. Newmark, 16 A.3d 1, 12 (Del. Ch. 2010). Here, by contrast, the PSAs grant certificateholders a contractual right to receive distributions. Moreover, the New York certificates have a fixed maturity date, further evidencing their status as debt rather than equity. See TIFD III-E, 459 F.3d at 235 n.13. And the certificateholders have no role in managing the trusts. Thus, the New York certificates are debt securities, not equity.

The statements on the SEC website do not compel a different conclusion. These statements do not warrant controlling deference because "interpretations contained in policy statements, agency manuals, and enforcement guidelines . . . [are] beyond the Chevron pale." Mead, 533 U.S. at 234 (quoting Christensen v. Harris County, 529 U.S. 576, 587 (2000)) (internal quotation marks omitted). Rather, courts afford such informal agency opinions "respect proportional to [their] 'power to persuade[.]'" Mead, 533 U.S. at 235 (quoting Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944)). More specifically, courts grant Skidmore deference to an agency's interpretation based on "its writer's thoroughness, logic, and expertness, its fit with prior interpretations, and any other sources of weight." Mead, 533 U.S. at 235.

-11-

Here, the conclusory statements on the SEC website are unsupported, contrary to the case law, and unpersuasive. Therefore, they do not merit Skidmore deference. See Walker v. Eggleston, No. 04 Civ. 0369 (WHP), 2006 WL 2482619, at *5 (S.D.N.Y. Aug. 29, 2006) (declining to grant Skidmore deference where agency "offered nothing more than its ipse dixit"). According to the website, "[c]ertificates representing a beneficial ownership interest in a trust . . . are treated as exempt from the Trust Indenture Act under Section 304(a)(2) thereof." Section 304(a)(2) of the TIA exempts "any certificate of interest or participation in two or more securities having substantially different rights and privileges, or a temporary certificate for any such certificate[.]" 15 U.S.C. § 77ddd(a)(2). Unfortunately, the SEC supplies no analysis supporting its conclusion that § 304(a)(2) covers mortgage-backed securities such as the New York certificates. And the structure of the New York certificates suggests that this section does not apply. They do not evidence "participation" in the underlying mortgage loans because the certificateholders' rights are not wholly contingent on the performance of those loans. If, for example, the mortgage loans generate "Excess Proceeds," the master servicer—and not the certificateholders—receives those funds. (PSA § 3.14.) And the master servicer—not the certificateholders—is entitled to all profits generated from investing the funds contained in the Distribution and Certificate Accounts, but must repay any losses. (PSA § 3.05(e).) Because the New York certificates are debt securities, the TIA applies.

-12-

**A12**

B.  Trust Indenture Act Section 315(a)

Apart from arguing that the New York certificates are exempt from the TIA, BNYM contends that various provisions of the TIA are inapplicable.

1.  Breach of the PSAs, Indenture, and SSA

BNYM challenges Plaintiffs' reliance on § 315(a) of the TIA, which provides in relevant part that an indenture "shall be deemed to provide" that "the indenture trustee shall not be liable except for the performance of such duties as are specifically set out in such indenture." 15 U.S.C. § 77ooo(a)(1). Relying on this language, Plaintiffs contend that BNYM violated the TIA whenever it failed to perform its duties under the PSAs, Indenture, or SSA. BNYM responds that § 315(a) merely limits a trustee's duties to those performed in the indenture, and does not impose any actionable federal duties on trustees.

By its plain language, § 315(a) requires that indentures contain language limiting a trustee's duties to those set forth in the indenture. It does not suggest that every violation of an indenture is a per se violation of the TIA. In 1990, Congress amended the TIA to make such limiting language mandatory in all indentures. See Semi-Tech Litig., LLC v. Bankers Trust Co., 353 F. Supp. 2d 460, 474 n.69 (S.D.N.Y. 2005), aff'd sub nom., In re Bankers Trust Co., 450 F.3d 121 (2d Cir. 2006) (per curiam). Thus, "prior to default . . . a trustee's duties are limited to what is set forth in the indenture and the statute." Semi-Tech, 353 F. Supp. 2d at 471. But the 1990 TIA amendments did not change the fact that § 315(a) limits a trustee's responsibilities to those enumerated in the indenture, rather than imposing additional federal obligations. See 15 U.S.C. § 77ooo(a)(1). Accordingly, Plaintiffs' § 315(a) claims based on this theory are dismissed with prejudice.

-13-

## 2. Duty to "Examine the Evidence"

Plaintiffs also contend that BNYM violated § 315(a) of the TIA by failing to examine the evidence provided by the master servicer certifying compliance with the PSAs and SSA. (Compl. ¶ 86.) They rely on the final clause of § 315(a), which imposes a pre-default duty on a trustee to "examine the evidence furnished to it pursuant to section 77nnn of this title to determine whether or not such evidence conforms to the requirements of the indenture." 15 U.S.C. § 77ooo(a).

Importantly, § 315(a) does not require a trustee to examine all evidence it might receive. Rather, the trustee's duty is limited to examining evidence furnished under § 77nnn, which requires "[e]ach person who . . . is or is to be an obligor" to provide certain information to the trustee. 15 U.S.C. § 77nnn(a). The TIA defines an "obligor," when the term is "used with respect to any indenture security," as "every person (including a guarantor) who is liable thereon, and, if such security is a certificate of interest or participation, such term means also every person (including a guarantor) who is liable upon the security or securities in which such certificate evidence an interest or participation[.]" 15 U.S.C. § 77ccc(12). Taking these provisions together, § 315(a) requires trustees to examine evidence provided by "obligors," but not evidence supplied by others.

BNYM contends that the "examine the evidence" provision does not apply here because Countrywide and its successor Bank of America are not "obligors," and because its duty to examine evidence extends only to form, not substance. Plaintiffs offer no rejoinder to this argument. Accordingly, Plaintiffs are deemed to have abandoned this claim, and it is dismissed with prejudice. See Lipton v. Cnty. of Orange, N.Y., 315 F. Supp. 2d 434, 446 (S.D.N.Y. 2004)

-14-

**A14**

("This Court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed.").

    C.  <u>Trust Indenture Act §§ 315(b)-(c)</u>

        Section 315(b) of the TIA requires trustees to provide security holders with notice of defaults. <u>See</u> 15 U.S.C. § 77ooo(b). Section 315(c) imposes heightened duties on trustees following an "event of default." <u>See</u> <u>Semi-Tech</u>, 353 F. Supp. 2d at 478-80 (citing 15 U.S.C. § 77ooo(c)). The term "default" as used in TIA derives its meaning from the indenture. <u>See</u> 15 U.S.C. § 77ooo(c). Plaintiffs allege that BNYM violated these requirements by failing to give notice of Countrywide's and Bank of America's repeated breaches of their duties as master servicer, and by failing to act prudently after these alleged defaults.

        BNYM does not dispute that the TIA imposes a duty to provide notice of defaults, nor does it disagree that "after default (as such term is defined in the indenture) a trustee is held to a prudent person standard." <u>Semi-Tech</u>, 353 F. Supp. 2d at 471-72 (quoting 15 U.S.C. §77ooo(c)) (internal punctuation omitted). Rather, BNYM counters that the Indenture governing the Delaware trust limits "defaults" to breaches by the issuer, and Plaintiffs only allege breaches by the master servicer. BNYM further argues that the TIA's focus on "indenture[s]" dictates that the Delaware Indenture, and not the SSA, must provide the controlling definition of "default."

    1.  <u>Events of Default Under the PSAs</u>

        The PSAs governing the New York trusts define an "event of default" to include "any failure by the Master Servicer to deposit in the Certificate Account or remit to the Trustee any payment required to be made under the terms of this Agreement[.]" (PSA § 7.01(i).) The PSAs' definition of "event of default" also encompasses "any failure by the Master Servicer to

-15-

observe or perform in any material respect any other of the covenants or agreements on the part of the Master Servicer contained in this Agreement[.]" (PSA § 7.01(ii).)

   As these provisions make clear, a "default" occurs under the PSAs when the master servicer—here, Countrywide—fails to perform certain contractual obligations. Under the TIA, such master servicer defaults trigger the trustee's duty to give notice, and subject the trustee to the "prudent person" standard. See 15 U.S.C. §§77ooo(b)-(c). Plaintiffs allege that Countrywide and Bank of America breached the PSAs by failing "to provide mortgage loan files in their possession, to cure defects in the mortgage loan files and/or to substitute the defective loans with conforming loans." (Compl. ¶ 87.) As such, Plaintiffs plead "defaults" of the PSAs sufficient to trigger BNYM's duties under §§ 315(b) and (c) of the TIA. Accordingly, BNYM's motion to dismiss these claims is denied.

  2. Events of Default Under the Delaware Indenture

   In contrast to the PSAs, the Indenture underlying the Delaware notes defines an "event of default" to include certain failures of the issuer, rather than the master servicer. The Indenture provides that an "event of default" occurs when the issuer fails to pay interest or principal to the noteholders. (Indenture §§ 5.01(i)-(ii).) More broadly, an "event of default" occurs under the Indenture if there is a "default in the performance of any obligation of the Issuer under this Indenture . . . or [if] any representation or warranty of the Issuer made in this Indenture or in any certificate or other writing delivered in connection with this Indenture proves to have been materially incorrect as of the time when it was made[.]" (Indenture § 5.01(iii).) Under §§ 3.05(iv) and 3.05(v) of the Indenture, the issuer—i.e., the trust—is obligated to "enforce any rights with respect to any of the Collateral, [i.e., the underlying mortgages]" and is

-16-

required to "preserve and defend title to the Collateral and the rights of the Indenture Trustee, the Credit Enhancer, and the Noteholders in the Collateral against all adverse claims."

Together with the Indenture, the Delaware trust entered into an SSA—a contract with Countrywide—whereby Countrywide, as master servicer, agreed to "service and administer the Mortgage Loans[.]" (SSA § 3.01(a).) As in the PSAs, Countrywide also assumed the responsibility of curing or repurchasing defective loans. (SSA § 3.06.) Plaintiffs allege that Countrywide and Bank of America failed to furnish mortgage loan files to the trustee, failed to cure any defects in those mortgage loan files, and failed to replace defective loans with conforming loans. (Compl. ¶ 87.) While these alleged failures constituted direct breaches of the SSA, they also violated the issuer's duties under the Indenture. After all, if Countrywide and Bank of America failed to cure or repurchase defective mortgages, the issuer similarly failed to "enforce any rights with respect to any of the Collateral," as the Indenture required it to do. (Indenture § 3.05(iv).) Under the Indenture, an "event of default" occurs when there is a "default in the performance of any obligation of the Issuer under this Indenture." (Indenture § 5.01(iii).) Thus, Plaintiffs allege "defaults" of the Indenture sufficient to impose heightened duties on BNYM under TIA §§ 315(b) and (c). BNYM's motion to dismiss these claims is denied.

### D. Trust Indenture Act § 316(b)

BNYM also attacks Plaintiffs' reliance on § 316(b) of the TIA, which provides that "the right of any indenture security to receive payment of the principal . . . and interest . . . shall not be impaired or affected without the consent of such holder." 15 U.S.C. § 77ppp(b). According to BNYM, § 316(b) only prevents non-consensual impairments to certificateholders' right to demand payment of interest and principal. See In re Nw. Corp., 313 B.R. 595, 600

-17-

(Bankr. D. Del. 2004) ("[Section 316(b)] applies to the holder's <u>legal</u> rights and not the holder's <u>practical</u> rights to the principal and interest itself.") (emphasis in original).

Plaintiffs do not respond to BNYM's arguments. Accordingly, the § 316(b) claim is deemed abandoned, and it is dismissed with prejudice. <u>See</u> <u>Lipton</u>, 315 F. Supp. 2d at 446.

IV.    <u>Supplemental Jurisdiction</u>

This Court may exercise supplemental jurisdiction over Plaintiffs' state law claims if they "form part of the same case or controversy" as the remaining TIA claims. 28 U.S.C. § 1367(a). Exercising supplemental jurisdiction is appropriate where state and federal claims "derive from a common nucleus of operative fact." <u>Shahriar v. Smith & Wollensky</u> <u>Restaurant Grp., Inc.</u>, 659 F.3d 234, 245 (2d Cir. 2011) (quoting <u>Briarpatch Ltd. v. Phoenix</u> <u>Pictures, Inc.</u>, 373 F.3d 296, 208 (2d Cir. 2004)) (internal quotation marks omitted). Here, Plaintiffs' state law claims are based on the same alleged failures of BNYM and Countrywide underlying the remaining TIA claims. As such, this Court retains supplemental jurisdiction over the state law claims.

CONCLUSION

For the foregoing reasons, BNYM's motion to dismiss the Complaint is granted in part and denied in part. Because Plaintiffs lack standing to pursue claims regarding trusts in which they never invested, all such claims are dismissed with prejudice. Further, BNYM's motion to dismiss Plaintiffs' claims under TIA §§ 315(a) and 316(b) is granted, and those claims are also dismissed with prejudice. BNYM's motion to dismiss Plaintiffs' claims under TIA §§ 315(b) and 315(c) is denied. This Court exercises supplemental jurisdiction over Plaintiffs' state law claims.

The Clerk of the Court is directed to terminate the motion pending at ECF No. 18.

Dated: April 3, 2012
      New York, New York

SO ORDERED:

WILLIAM H. PAULEY III
U.S.D.J.

*Counsel of Record:*

Max R. Schwartz, Esq.
Beth A. Kaswan, Esq.
Joseph P. Guglielmo, Esq.
Scott & Scott, LLC
500 Fifth Avenue, 40th floor
New York, NY 10110
*Counsel for Plaintiffs*

Matthew D. Ingber, Esq.
Mayer Brown LLP
1675 Broadway
New York, NY 10019
*Counsel for Defendant*

-19-

A19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
                        :

RETIREMENT BOARD OF THE              11 Civ. 5459 (WHP)
POLICEMEN'S ANNUITY AND          :
BENEFIT FUND OF THE CITY           MEMORANDUM & ORDER
OF CHICAGO, *et al.*,               :

            Plaintiffs,        :

            -against-          :

THE BANK OF NEW YORK MELLON,  :

            Defendant.      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 2/14/13

WILLIAM H. PAULEY III, District Judge:

      The Bank of New York Mellon ("BNYM") moves for reconsideration of this

Court's Memorandum & Order dated April 3, 2012 (the "April 3 Order") granting BNYM's

motion to dismiss the complaint in part and denying it in part. In the alternative, BNYM moves

to certify the April 3 Order for interlocutory appeal. For the following reasons, BNYM's motion

for reconsideration is denied, but this Court certifies the April 3 Order for interlocutory appeal.

## BACKGROUND

I.    Factual Background

      The April 3 Order sets forth the allegations underlying this action. See Ret. Bd.

of the Policemen's Annuity & Benefit Fund of Chi. v. Bank of N.Y. Mellon, ---F. Supp. 2d----,

2012 WL 1108533, at *1-*2 (S.D.N.Y. 2012). To summarize, Plaintiffs own mortgage-backed

securities for which BNYM serves as trustee. They allege that BNYM violated the Trust

Indenture Act of 1939, 15 U.S.C. § 77aaa, et seq. (the "TIA") and breached its contractual and

fiduciary duties.

More specifically, Plaintiffs hold securities issued by twenty-five New York trusts and one Delaware trust. (Class Action and Derivative Complaint, dated Aug. 31, 2011 ("Compl.") Ex. B.) BNYM is trustee for the New York trusts and Countrywide (now Bank of America) is the "master servicer." (Compl. ¶¶ 1, 15, 96 n. 2.) The terms of the New York trusts as well as the rights, duties, and obligations of the trustee and the master servicer are set forth in Pooling and Servicing Agreements ("PSAs"). (Compl. ¶ 2; Compl. Ex. C: Pooling and Servicing Agreement dated Sept. 1, 2006.) The PSAs also govern the trustee's distribution of money to certificateholders. (Compl. ¶¶ 1, 2.) The Delaware trust operates similarly, with a few key differences. The Delaware trust issued notes, subject to an indenture, for which BNYM serves as indenture trustee. (Declaration of Matthew D. Ingber, dated Dec. 16, 2011 ("Ingber Decl.") Ex A: Indenture, dated Mar. 30, 2006 § 3.04, Annex 1 (Glossary).) Concurrently, the Delaware trust entered into a Sale and Servicing Agreement ("SSA") with Countrywide (now Bank of America) governing the sale of the underlying mortgage loans and the master servicer's responsibilities. (Ingber Decl. Ex. B: Sale and Servicing Agreement, dated Mar. 30, 2006.)

II.     Procedural Background

On its motion to dismiss, BNYM conceded that the mortgage-backed notes issued by the Delaware trust are debt securities to which the TIA applies. BNYM contended, however, that the certificates issued by the twenty-five New York trusts are equity securities exempt from the TIA under section 304(a)(1). BNYM relied heavily on several treatises to support its position. BNYM also argued that the structure of the New York certificates closely resembles equity. BNYM did not invoke any TIA exemption other than section 304(a)(1). Specifically, BNYM did not contend that the New York certificates were exempt under section 304(a)(2) as

2

**A21**

"certificates of interest or participation in two or more securities having substantially different rights and privileges[.]" 15 U.S.C. § 77ddd(a)(2).

In its reply brief in support of its motion to dismiss, BNYM mentioned in passing that the United States Securities and Exchange Commission (the "SEC") agreed that the New York certificates were TIA-exempt and cited informal guidance published on the SEC's website. BNYM failed to observe, however, that the SEC relied on section 304(a)(2) of the TIA, and not section 304(a)(1). Rather, BNYM simply pointed the Court to the SEC's website and argued that the SEC's guidance "merit[s] some deference." United States v. Mead Corp., 533 U.S. 218, 234 (2001).

After this Court issued the April 3 Order, BNYM moved for reconsideration and advanced several new theories. The Court also received several amicus curiae submissions supporting BNYM's motion for reconsideration. For the most part, these submissions raise policy-based objections to the April 3 Order and do not address in any detail the issues of statutory interpretation at the heart of this motion. And "this [C]ourt knows the difference between a friend of the court and a friend of one of the litigants." SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC, 407 F. Supp. 2d 587, 590 (S.D.N.Y. 2006) (Mukasey, J.). When amici that are "aligned with one who has interest in the outcome of a case" submit briefs "in direct response to an opinion of this [C]ourt that is adverse to that interest," their arguments "will have to stand or fall not on the purported authority of [their] source but solely on [their] own internal logic." SR Int'l, 407 F. Supp. 2d at 590. Further, "[e]verything [BNYM and its amici have] submitted on this motion should have been before the Court earlier, which is more than sufficient

3

**A22**

reason to deny its motion as an unwarranted imposition on the Court and, indeed, its adversary." Bridgeman Art Library, Ltd. v. Corel Corp., 36 F. Supp. 2d 191, 192 (S.D.N.Y. 1999).

DISCUSSION

I.      Legal Standard

        BNYM purports to seek reconsideration of the April 3 Order under Federal Rules of Civil Procedure 59 and 60 and Local Rule 6.3. But because the April 3 Order is not a "judgment" or "final judgment," neither Rule 59(e) nor Rule 60(b) applies. In re Palermo, No. 08 Civ. 7421 (RPP), 2011 WL 446209, at *4 (S.D.N.Y. Feb. 7, 2011); see also Floyd v. City of New York, 813 F. Supp. 2d 457, 464 (S.D.N.Y. 2011) ("Because that decision did not fully adjudicate the parties' claims, it was not appealable and thus not final for the purposes of Rule 60(b)."). Rather, "the only ground available for [BNYM] to move for reconsideration is under Local Civil Rule 6.3." In re Palermo, 2011 WL 446209, at *4.

        A motion for reconsideration under Local Civil Rule 6.3 "will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked— matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995). "It is implicit in this language that a motion for reconsideration cannot assert new arguments or claims which were not before the court on the original motion and consequently cannot be said to have been considered." Koehler v. Bank of Bermuda, Ltd., No. M18-302 (CSH), 2005 WL 1119371, at *1 (S.D.N.Y. May 10, 2005) (emphasis in original). In other words, "Rule 6.3 is intended to 'ensure the finality of decisions and to prevent the practice of a losing party examining a decision then plugging the gaps of a lost motion with additional matters.'" SEC v. Ashbury Capital Partners,

4

L.P., No. 00 Civ. 7898 (RCC), 2001 WL 604044, at *1 (S.D.N.Y. May 31, 2001) (quoting

Carolco Pictures, Inc. v. Sirota, 700 F. Supp. 169, 170 (S.D.N.Y. 1988)).  Reconsideration is not

an invitation for parties to "treat the court's initial decision as the opening of a dialogue in which

that party may then use such a motion to advance new theories or adduce new evidence in

response to the court's rulings." De Los Santos v. Fingerson, No. 97 Civ. 3972 (MBM), 1998

WL 788781, at *1 (S.D.N.Y. Nov. 12, 1998).  "The standard is strict and the decision is within

the sound discretion of the district court."  Robbins v. H.H. Brown Shoe Co., No. 08 Civ. 6885

(WHP) 2009 WL 2496024, at *1 (S.D.N.Y. July 22, 2009) (internal quotation marks omitted).

II.    Applicability of the TIA

    A.    Section 304(a)(1)

        BNYM contends that this Court overlooked certain legal and factual issues in

denying its motion to dismiss Plaintiffs' TIA claims regarding the New York certificates.  As in

its original moving papers, BNYM asserts that the New York certificates are exempt from the

TIA because they are equity securities.  However, BNYM points to no controlling legal

authorities or factual matters that this Court overlooked.  Rather, BNYM argues that this Court

improperly rested its conclusion on an application of the factors that the IRS considers in

differentiating debt securities from equity securities.  See TIFD III-E, Inc. v. United States, 459

F.3d 220, 235 n.15 (2d Cir. 2006) (quoting IRS Notice 94-47, 1994-19 I.R.B. 9 (Apr. 18, 1994)).

        But this Court did not rely exclusively on those factors.  Rather, this Court

concluded that the New York certificates more closely resembled debt than equity and observed

that many courts have characterized mortgage-backed securities similar to the New York

certificates as "debt."  See, e.g., LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp., 424

A24

F.3d 195, 200 (2d Cir. 2005); <u>CWCapital Asset Mgmt., LLC v. Chi. Props., LLC</u>, 610 F.3d 497,

499 (7th Cir. 2010) (Posner, J.); <u>Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.</u>,

837 F. Supp. 2d 162, 182 (S.D.N.Y. 2011) ("[A]s many courts have observed, pass-through

certificates are structurally similar in form and function to bonds issued under an indenture."); <u>In</u>

<u>re Sec. Capital Assurance Ltd. Sec. Litig.</u>, 729 F. Supp. 2d 569, 575 (S.D.N.Y. 2010) (referring

to certificates in residential mortgage-backed securities as "debt securities"); <u>Trust for Certificate</u>

<u>Holders of Merrill Lynch Mortg. Passthrough Certificates Series 1999-C1 v. Love Funding</u>

<u>Corp.</u>, No. 04 Civ. 9890 (SAS), 2005 WL 2582177, at *1 (S.D.N.Y. Oct. 11, 2005) ("These

certificates are essentially bonds secured by a pool of commercial mortgages that the Trust has

purchased from lenders."). To the extent that BNYM challenges this Court's reliance on these

decisions, it merely repeats arguments that this Court previously considered and rejected.

      BNYM also argues that the New York certificates should not be characterized as

debt because they do not reflect an unconditional promise to pay a sum certain. According to

BNYM, such an obligation is absent because the duty to pay is contingent on the mortgagors'

making their principal and interest payments. But this argument is unavailing, as "crediting it

would ignore that the obligation to pay certificate-holders <u>always</u> exists; that obligation,

however, cannot be <u>met</u> if individual mortgagors default on their principal and interest

payments." <u>Policemen's Annuity & Benefit Fund of Chi. v. Bank of Am., NA</u>, ---F. Supp. 2d----,

2012 WL 6062544, at *16 (S.D.N.Y. 2012) (emphasis in original).

      Finally, BNYM and its <u>amici</u> cite, <u>inter alia</u>, an SEC no-action letter from 1988

and Department of Labor guidance from 1996 for the proposition that the New York certificates

are equity securities. But these agency pronouncements are not "controlling," and this Court did

6

**A25**

not overlook them. See Ivan Visin Shipping, Ltd. v. Onego Shipping & Chartering B.V., 543 F. Supp. 2d 338, 339 (S.D.N.Y. 2008) ("Controlling authority means decisions of the Second Circuit Court of Appeals or the U.S. Supreme Court[.]" (citation omitted)). In any event, these informal agency pronouncements are entitled only to "respect proportional to [their] 'power to persuade[.]'" Mead, 533 U.S. at 235 (quoting Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944)). And the cursory agency pronouncements on which BNYM and its amici rely lack persuasive power. Accordingly, this Court declines to reconsider its conclusion that the New York certificates are debt securities to which the TIA applies.

B. Section 304(a)(2)

BNYM also argues—for the first time—that the New York certificates are exempt under section 304(a)(2) of the TIA because they are "certificates of interest or participation in two or more securities having substantially different rights and privileges[.]" 15 U.S.C. § 77ddd(a)(2). But it cites no controlling law that this Court overlooked in reaching the opposite conclusion. To the contrary, BNYM supports its argument with a citation to a single district court opinion from the Eastern District of Pennsylvania. See Lavin v. Data Sys. Analysts, Inc., 443 F. Supp. 104, 109 (E.D. Pa. 1977). Besides the obvious fact that Lavin is not "controlling," that opinion does not address section 304(a)(2) at all. More fundamentally, "[a] motion for reconsideration is not an opportunity for making new arguments that could have been previously advanced, nor is it a substitute for appeal." In re Optimal U.S. Litig., 813 F. Supp. 2d 383, 387 (S.D.N.Y 2011) (internal quotation marks and footnotes omitted). Accordingly, this Court declines to consider new arguments for dismissal that BNYM failed to raise in its original briefs.

A26

BNYM also contends that this Court did not afford adequate deference to the conclusory statements regarding section 304(a)(2) on the SEC's website. In the April 3 Order, this Court declined to grant Skidmore deference to these statements. According to BNYM, however, the SEC statements merit heightened deference because they are "generally applicable," Estate of Landers v. Leavitt, 545 F.3d 98, 110 (2d Cir. 2008), and the TIA is part of "a large and complex regulatory scheme[.]" Cmty. Health Ctr. v. Wilson-Coker, 311 F.3d 132, 138 (2d Cir. 2002). BNYM also observes that the Second Circuit has afforded Skidmore deference to positions adopted by the SEC in an amicus brief. See In re New Times Sec. Servs., Inc., 371 F.3d 68, 82-83 (2d Cir. 2004). But an agency's amicus brief stands on a far different footing than unattributed statements on a website. An SEC amicus brief reflects the considered views of the Commission. See 17 C.F.R. § 200.21(a). By contrast, the SEC Division of Corporate Finance expressly cautions that the interpretations on its website "are not rules, regulations, or statements of the Commission" and that "the Commission has neither approved nor disapproved these interpretations." Division of Corporate Finance, Compliance and Disclosure Interpretations, http://www.sec.gov/divisions/corpfin/cfguidance.shtml (last visited Feb. 14, 2013). Moreover, that SEC website now states that "the staff is considering [its position] in light of" the April 3 Order. Trust Indenture Act of 1939, Questions and Answers of General Applicability, http://www.sec.gov/divisions/corpfin/guidance/tiainterp.htm (last visited Feb. 14, 2013).

In any event, BNYM asserts these arguments for the first time in support of its motion for reconsideration. At the motion to dismiss stage, BNYM cited the SEC website only in its reply brief and asserted that the statements deserved "some deference." Mead, 533 U.S. at

8

**A27**

234.  As this Court concluded in the April 3 Order, the conclusory statements on the SEC's

website are "beyond the <u>Chevron</u> pale." <u>Mead</u>, 533 U.S. at 234.  And this Court rejects BNYM's

attempt to advance novel theories on reconsideration.  <u>See</u> <u>In re Optimal</u>, 813 F. Supp. 2d at 387.

III.    Events of Default Under the Delaware Indenture

BNYM also seeks reconsideration of this Court's conclusion that Plaintiffs

adequately alleged "events of default" under the Delaware Indenture.  But, again, BNYM points

to no "controlling decisions or data that the court overlooked[.]"  <u>Shrader</u>, 70 F.3d at 257.

Rather, BNYM relitigates questions that this Court already resolved and attempts to introduce

new theories for dismissal.  To the extent BNYM contends that Plaintiffs failed to allege that the

"issuer"—as opposed to the "master servicer"—had any relevant duties, its cramped reading of

Plaintiffs' allegations reflects a misunderstanding of the Rule 12(b)(6) standard.  <u>See</u> <u>Anderson</u>

<u>News, L.L.C. v. Am. Media, Inc.</u>, 680 F.3d 162, 185 (2d Cir. 2012) (on a motion to dismiss,

courts "accept as true the factual allegations of the complaint, and construe all reasonable

inferences that can be drawn from the complaint in the light most favorable to the plaintiff"

(internal quotation marks and citation omitted)).  And this Court declines BNYM's invitation to

disregard the "strict" standard for reconsideration.  <u>Shrader</u>, 70 F.3d at 257.  Accordingly,

BNYM's motion for reconsideration is denied.

IV.    Interlocutory Appeal

Alternatively, BNYM requests that this Court certify the April 3 Order for

interlocutory appeal.  A district court may certify an order for interlocutory appeal if "the district

judge 'is of the opinion that such order involves a controlling question of law as to which there is

substantial ground for difference of opinion and that an immediate appeal may materially

advance the ultimate termination of the litigation.'" United States v. Culbertson, 598 F.3d 40, 45 (2d Cir. 2010) (quoting 28 U.S.C. § 1292(b)).

The question whether the TIA applies to the New York certificates is controlling because reversal of the April 3 Order, "even though not resulting in dismissal, could significantly affect the conduct of the action[.]" Primavera Familienstifung v. Askin, 139 F. Supp. 2d 567, 570 (S.D.N.Y. 2001). Further, the applicability of the TIA to the New York certificates raises "novel and complex" issues that could impact a large number of cases. In re Currency Conversion Fee Antitrust Litig., No. M 21-95, 2005 WL 1871012, at *3 (S.D.N.Y. Aug. 9, 2005). Another court in this District recently held that the TIA applies to mortgage-backed securities similar to those at issue here. See Bank of Am., 2012 WL 6062544, at *16. But BNYM and its amici advance arguments for reconsideration that—while beyond the scope permitted by Local Civil Rule 6.3—underscore the existence of substantial grounds for difference of opinion. In short, the applicability of the TIA to mortgage-backed securities remains unsettled, contributing to industry uncertainty.

While this action will continue irrespective of any ruling by the Court of Appeals, it may be considerably streamlined if the claims involving the twenty-five New York trusts are dismissed. Under these circumstances, the prompt resolution of this issue on appeal may materially advance the termination of this litigation. See Transp. Workers Union, Local 100 v. N.Y.C. Transit Auth., 358 F. Supp. 2d 347, 350 (S.D.N.Y. 2005) ("An immediate appeal is considered to advance the ultimate termination of the litigation if that appeal promises to advance the time for trial or to shorten the time required for trial.") (internal footnote and

quotation marks omitted). Accordingly, this Court certifies the April 3 Order for interlocutory appeal.

## CONCLUSION

For the foregoing reasons, BNYM's motion for reconsideration is denied. Further, this Court certifies its Memorandum & Order dated April 3, 2012 for interlocutory appeal under 28 U.S.C. § 1292(b). Any party seeking leave for the Court of Appeals to hear an interlocutory appeal shall direct its application to the Court of Appeals within ten days. See 28 U.S.C. 1292(b). The Clerk of Court is directed to terminate the motion pending at ECF No. 38.

Dated: February 14, 2013
      New York, New York

                                    SO ORDERED:

                                    WILLIAM H. PAULEY III
                                        U.S.D.J.

A30

*Counsel of Record:*

David R. Scott, Esq.
Beth A. Kaswan, Esq.
Deborah Clark-Weintraub, Esq.
Joseph P. Guglielmo, Esq.
Max R. Schwartz, Esq.
Scott & Scott, LLP
500 Fifth Avenue, 40th floor
New York, NY 10110

Anne L. Box, Esq.
Scott & Scott, LLP
707 Broadway, Suite 1000
San Diego, CA 92101

Geoffrey M. Johnson, Esq.
Scott & Scott, LLP
12434 Cedar Road, Suite 12
Cleveland Heights, OH 44106
*Counsel for Plaintiffs*

Matthew D. Ingber, Esq.
Paula G. Lin, Esq.
Christopher J. Houpt, Esq.
Mayer Brown LLP
1675 Broadway
New York, NY 10019
*Counsel for Defendant*

**A31**

Appendix C: Securitizations that have expressly rejected the order below

| Issuer | Depositor | Amount | Date | Doc ID |
|--------|-----------|--------|------|--------|
| Citigroup Commercial Mortgage Trust 2012-GC8 | Citigroup Commercial Mortgage Securities Inc. | $728,147,000 | 09/10/12 | 705310869 |
| COMM 2012-CCRE1 Mortgage Trust | Deutsche Mortgage & Asset Receiving Corporation | $824,379,000 | 05/18/12 | 705310890 |
| COMM 2012-CCRE2 Mortgage Trust | Deutsche Mortgage & Asset Receiving Corporation | $965,326,000 | 08/08/12 | 705310872 |
| COMM 2012-CCRE3 Mortgage Trust | Deutsche Mortgage & Asset Receiving Corporation | $875,989,000 | 10/03/12 | 705310862 |
| COMM 2012-CCRE4 Mortgage Trust | Deutsche Mortgage & Asset Receiving Corporation | $888,800,000 | 11/02/12 | 705310857 |
| COMM 2012-CCRE5 Mortgage Trust | Deutsche Mortgage & Asset Receiving Corporation | $793,565,000 | 12/06/12 | 705310853 |
| COMM 2013-CCRE6 Mortgage Trust | Deutsche Mortgage & Asset Receiving Corporation | $907,853,000 | 02/19/13 | 705310086 |
| COMM 2013-LC6 Mortgage Trust | Deutsche Mortgage & Asset Receiving Corporation | $1,326,238,000 | 01/24/13 | 705310099 |
| GS Mortgage Securities Trust 2012-GCJ7 | GS Mortgage Securities Corporation II | $1,456,847,000 | 05/18/12 | 705310887 |
| GS Mortgage Securities Trust 2012-GCJ9 | GS Mortgage Securities Corporation II | $1,083,364,000 | 11/16/12 | 705310855 |
| GS Mortgage Securities Trust 2013-GC10 | GS Mortgage Securities Corporation II | $656,352,000 | 01/24/13 | 705310091 |
| J.P. Morgan Chase Commercial Mortgage Securities Trust 2012-C6 | J.P. Morgan Chase Commercial Mortgage Securities Corp. | $1,003,546,000 | 04/18/12 | 705310885 |
| J.P. Morgan Chase Commercial Mortgage Securities Trust 2012-C8 | J.P. Morgan Chase Commercial Mortgage Securities Corp. | $795,606,000 | 09/27/12 | 705310842 |
| J.P. Morgan Chase Commercial Mortgage Securities Trust 2012-CIBX | J.P. Morgan Chase Commercial Mortgage Securities Corp. | $1,035,480,000 | 06/22/12 | 705310881 |
| J.P. Morgan Chase Commercial Mortgage Securities Trust 2012-LC9 | J.P. Morgan Chase Commercial Mortgage Securities Corp. | $750,360,000 | 12/12/12 | 705310848 |
| Morgan Stanley Bank of America Merrill Lynch Trust 2012-C5 | Morgan Stanley Capital I Inc. | $1,180,648,000 | 07/13/12 | 705310878 |
| Morgan Stanley Bank of America Merrill Lynch Trust 2012-C6 | Morgan Stanley Capital I Inc. | $978,846,000 | 10/03/12 | 705310865 |
| Morgan Stanley Bank of America Merrill Lynch Trust 2013-C7 | Morgan Stanley Capital I Inc. | $1,237,196,000 | 01/09/13 | 705310070 |
| Morgan Stanley Bank of America Merrill Lynch Trust 2013-C8 | Banc of America Merrill Lynch Commercial Mortgage Inc. | $1,015,614,000 | 02/05/13 | 705310076 |
| Sequoia Mortgage Trust 2012-3 | Sequoia Residential Funding, Inc. | $289,039,000 | 06/26/12 | 705310824 |
| Sequoia Mortgage Trust 2012-4 | Sequoia Residential Funding, Inc. | $308,367,000 | 09/20/12 | 705310836 |

Appendix C: Securitizations that have expressly rejected the order below

| | | | | |
|---|---|---|---|---|
| Sequoia Mortgage Trust 2012-5 | Sequoia Residential Funding, Inc. | $314,412,000 | 10/26/12 | 705310823 |
| Sequoia Mortgage Trust 2012-6 | Sequoia Residential Funding, Inc. | $295,885,000 | 11/27/12 | 705310822 |
| UBS Commercial Mortgage Trust 2012-C1 | UBS Commercial Mortgage Securitization Corp. | $1,111,330,000 | 04/24/12 | 705310884 |
| UBS-Barclays Commercial Mortgage Trust 2012-C2 | UBS Commercial Mortgage Securitization Corp. | $851,237,000 | 06/28/12 | 705310879 |
| UBS-Barclays Commercial Mortgage Trust 2012-C3 | UBS Commercial Mortgage Securitization Corp. | $757,443,000 | 09/14/12 | 705310866 |
| UBS-Barclays Commercial Mortgage Trust 2012-C4 | UBS Commercial Mortgage Securitization Corp. | $1,019,267,000 | 12/06/12 | 705310844 |
| UBS-Barclays Commercial Mortgage Trust 2013-C5 | UBS Commercial Mortgage Securitization Corp. | $1,039,529,000 | 02/11/13 | 705310829 |
| Wells Fargo Commercial Mortgage Trust 2012-LC5 | Wells Fargo Commercial Mortgage Securities, Inc. | $1,136,676,000 | 09/19/12 | 705310871 |
| WFRBS Commercial Mortgage Trust 2012-C7 | RBS Commercial Funding Inc. | $789,655,000 | 06/07/12 | 705310882 |
| WFRBS Commercial Mortgage Trust 2012-C8 | Wells Fargo Commercial Mortgage Securities, Inc. | $1,020,079,000 | 07/20/12 | 705310876 |
| WFRBS Commercial Mortgage Trust 2012-C9 | RBS Commercial Funding Inc. | $931,741,000 | 10/16/12 | 705310860 |
| WFRBS Commercial Mortgage Trust 2012-C10 | Wells Fargo Commercial Mortgage Securities, Inc. | $1,060,364,000 | 11/30/12 | 705310850 |
| WFRBS Commercial Mortgage Trust 2013-C11 | RBS Commercial Funding Inc. | $1,292,693,000 | 01/28/13 | 705310089 |
| | **Total** | **$30,721,873,000** | | |

**A33**

# CERTIFICATE OF SERVICE

Pursuant to Federal Rules of Appellate Procedure 25(c)(1)(C) and (d)(1)(A), I hereby certify that on February 25, 2013, a true and correct copy of the foregoing Petition for Permission for Leave to File Interlocutory Appeal was served both by electronic mail and by third-party commercial carrier for delivery within three days upon counsel of record for plaintiffs-respondents:

Beth A. Kaswan
Deborah Clark-Weintraub
Max R. Schwartz
Scott + Scott LLP
500 Fifth Avenue, 40th Floor
New York, NY 10110

Dated: February 25, 2013    /s/ Paul W. Hughes
                            Paul W. Hughes
                            Mayer Brown LLP
                            1999 K Street NW
                            Washington, DC 20006